IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 13, 2001 Session

## STATE OF TENNESSEE v. CHRISTINA SUE LIBERTUS

**Direct Appeal from the Circuit Court for Bedford County**
**No. 14486      William Charles Lee, Judge**

---

**No. M1999-01710-CCA-OT-CO - Filed July 5, 2001**

---

The Defendant pled guilty in 1999 to ten counts of forgery committed in Bedford County. Following a sentencing hearing, the trial court sentenced the Defendant as a Range II multiple offender to an effective sentence of six years, four months incarceration. In this direct appeal, the Defendant argues that she was improperly sentenced. Having reviewed the record, we conclude that the Defendant's sentence is appropriate and therefore affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Matthew Quentin Bastian, Columbia, Tennessee, for the Appellant, Christina Sue Libertus.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William Michael McGown, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

On April 19, 1999, the Bedford County Grand Jury returned a ten-count indictment charging the Defendant, Christina Sue Libertus, with forgery. On August 16, 1999, the Defendant pled guilty to all charges. Following a sentencing hearing conducted on September 27, 1999, the trial court sentenced the Defendant as a Range II multiple offender to three years, two months incarceration for each count. The court ordered that the sentences for counts one through five be served concurrently, but consecutive to the sentences for counts six through ten. The court also ordered that the sentences for counts six through ten be served concurrently, but consecutive to the sentences for counts one through five. The Defendant thus received an effective sentence of six years, four months in the Tennessee Department of Correction. In this appeal as of right, the Defendant contends that she was improperly sentenced. Having thoroughly reviewed the record, we affirm the judgment of the trial court.

# I. FACTUAL BACKGROUND

In 1998, the Defendant was arrested for forging nine checks from the Trans Financial checking account of Melissa Fulks, the victim, and for forging the victim's name on an application for credit at Gordon's Jewelers in Shelbyville, Tennessee. At the sentencing hearing, the Defendant testified that she was twenty-six years old and the single mother of two boys, ages four and seven. She stated that she never married the father of her children, although she was "together with him for 12 years." She stated, "He beat me. He lied to me. Cheated on me." She testified that the boys' father "had been in and out of jail for the last 10 or 12 or 13 years," and she had therefore raised the children almost exclusively on her own. At the time of the sentencing hearing, the Defendant lived with Kendrick Mark Buckmon, a man whom she had known for approximately seven years and with whom she had been romantically involved for approximately a year. She testified that she and Buckmon shared the responsibility of raising her children and that the boys referred to Buckmon as "daddy."

The Defendant testified that in late April and early May 1994, she committed forgery by writing three illegal checks. She reported that for these crimes, she was placed on Community Corrections, which she completed successfully. When she was arrested for the crimes, she was also charged with simple possession of marijuana and possession of paraphernalia, specifically a marijuana pipe. However, the Defendant claimed that the marijuana was not hers, although it was in her house, and that she "got drugged into saying it was" hers. She explained, "[T]hey said as long as I was already being charged for it I might as well be saying I was using it so this other person wouldn't get in trouble for using it, too." However, the Defendant admitted that she was aware that "there was a joint in [her] house." She testified that the drug charges were eventually dismissed.

The Defendant also testified that in 1994, while two months pregnant with her youngest son, she was charged with leaving the scene of an accident. She explained that she was in a car accident, and the steering wheel of the car hit her stomach. She recalled that the father of her children removed her from the vehicle, and she went to her home to lie on the couch immediately after the accident. For the crime of leaving the scene of an accident, the Defendant was sentenced to eleven months, twenty nine days incarceration, all suspended except for forty-eight hours, and placed on eleven months, twenty-nine days supervised probation.

The Defendant further testified that in 1998, her house caught on fire, and she and her children were left without a place to live. She stated that she moved in with Terry Wayne Farrar. She stated that while she lived with Farrar, she paid no rent, half of the light bill, half of the water bill, half of the cable bill, and a gas bill. She recalled that at the time, she was working at Wendy's, where she made approximately $200 each week.

The Defendant stated that while she lived with Terry Wayne Farrar, he and his cousin, Timmy Farrar, stole a purse belonging to Melissa Fulks. Inside the purse was a checkbook. The Defendant claimed that the men suggested that they use the checks. She explained that the men could not forge the checks themselves because the owner of the checks was a woman. The

Defendant maintained that she initially refused to forge the checks, but claimed that she ultimately agreed to commit forgery "to feed [her] children."

The Defendant admitted that on May 16, 1998, she wrote one check to Wal-Mart in the amount of $300.73 to purchase clothes for her children and another check to Food Max in the amount of $190.20 to purchase food. She also admitted that on May 17, 1998, she wrote a check to Sears for $126.87, although she could not remember what she purchased there, and a check to Kaybee, a toy store, in the amount of $179.65 to purchase toys for her children and for Timmy Farrar's children. She also admitted that she applied for credit in the name of Melissa Fulks at Gordon's Jewelers and wrote a check there in the amount of $393.00 so that Timmy Farrar could purchase a ring and bracelet. She stated that Timmy Farrar kept the jewelry after she purchased it and later gave it to "a crack man" to support his drug habit. She next admitted that she wrote a check to B and H Shoes on May 17, 1998 in the amount of $225.00 to purchase shoes for either her children or for Timmy Farrar's children, although she could not remember specifically what she bought at B and H shoes. Finally, she admitted that on May 17, 1998, she wrote another check to Food Lion in the amount of $102.71, a check to Wal-Mart in the amount of $26.02, and a check to Save-a-Lot in the amount of $110.19. The Defendant testified that she and Timmy Farrar "split everything down the middle." She also stated that each time she wrote a check from Melissa Fulks' account, Timmy Farrar was with her and that Terry Wayne Farrar "was hiding and stood out and waited."

The Defendant testified that after her arrest, she attempted to make restitution for the crimes by putting money into an escrow account provided by her lawyer's office. She stated that she managed to save $850.00 toward the total restitution amount of $1,856.21, but maintained that the court clerk's office refused to accept the money because it would not accept partial restitution. The Defendant claimed, however, that soon after the court clerk's office refused to accept the partial restitution, several events occurred that forced her to use the $850.00 she had saved. She stated that one of her sons became ill and was hospitalized for seven days; that her apartment caught fire, forcing her to find another place to live; and that she had to have surgery.

The Defendant maintained, however, that her life had become much more stable since the time of the crimes. She stated that she and Buckmon were raising her children together and that Buckmon treated the children as if they were his own. She testified that she and Buckmon helped the children with their homework. She also testified that she was waiting tables, and she stated that since she had last been in court, she had put $300.00 into a trust account for restitution. In addition, the Defendant reported that she and Buckmon, who had been estranged from his wife for some time, planned to wed after his divorce became final.

The Defendant testified that if she were to be incarcerated, she feared for her children. She described difficulties her children had encountered because of their biracial heritage and stated that she helped them through these difficulties. She admitted that she knew she had hurt her children by committing crimes. However, the Defendant maintained that she explained to her children that

stealing was wrong and that she "shouldn't have done it." She stated that if she were to be incarcerated, "[i]t would destroy [her] children."

On cross-examination, the Defendant admitted that she had used both marijuana and crack cocaine. She stated that she last smoked marijuana about two months prior to the sentencing hearing, but claimed that it was the only time she had smoked marijuana since her arrest for the charges in this case. She testified that she last used crack cocaine approximately two years before the sentencing hearing and had used it "[p]robably about four times or more" during 1997.

The Defendant also testified on cross-examination that she was receiving public assistance at the time of the crimes in this case, but she stated that she had not received public assistance in the twelve months prior to the sentencing hearing. However, she testified that she did receive food stamps and had been receiving them since her children were born. The Defendant also admitted that she smoked cigarettes at the time of the crimes in this case and characterized the cigarettes as a necessity because of a physical condition. She stated, "I get the shakes real bad. I have been taking medicine for it. Sometimes [it doesn't] help. Sometimes a cigarette does." In addition, the Defendant testified that she had not completed high school or obtained her G.E.D., but she reported that she had applied "to go to school" and was "waiting for the answer."

Finally, the Defendant stated that if she were to be incarcerated, Buckmon could take care of her children, but she maintained, "[P]hysically and mentally, he couldn't support my children. He couldn't raise my children." She admitted that she was aware at the time she forged the checks in this case that she could lose her children, her house, and her job as a result of her actions.

Kendrick Mark Buckmon also testified at the sentencing hearing. He verified that he had known the Defendant for approximately seven years and stated, " As soon as I get my divorce I will be marrying her." He explained that at the time of the sentencing hearing, he had been married for three or four years, but had been estranged from his wife since the first year of their marriage. He reported that he had no children from the marriage. He also reported that he had filed for a divorce during the week prior to the sentencing hearing.

Buckmon characterized his relationship with the Defendant as "a good relationship" and testified that he enjoyed activities with the Defendant's children. Buckmon also testified that the Defendant had a good relationship with her children and tried "to teach them to be good and do right." He stated that in the year prior to the sentencing hearing, the Defendant had reported to her job regularly and that when she was not at work, she was home with her children. Buckmon testified that he and the Defendant helped the children with their homework. He stated that if the Defendant did not receive jail time, she planned to "[s]tay at home; go to work; and cook for us." Finally, Buckmon testified that he was employed at National Pen.

## II. ANALYSIS

The Defendant now contends that she was improperly sentenced. She contests her classification as a Range II offender and the lengths of her sentences. She also argues that the trial court erred by ordering consecutive sentences and by denying alternative sentencing.

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). Because the trial court in this case made an affirmative showing on the record that it considered all relevant facts, circumstances, and sentencing principles in sentencing the Defendant, our review of the Defendant's sentences is de novo with a presumption of correctness.

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement and mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

## A. SENTENCING RANGE

The Defendant first contends that the trial court erred by sentencing her as a Range II multiple offender. The Defendant pled guilty in this case to ten counts of forgery, which is a Class E felony. See Tenn. Code Ann. § 39-14-114(c). The trial court based its classification of the Defendant as a Range II multiple offender on prior convictions for forgery committed in 1994. The trial court stated, "The State has proven beyond a reasonable doubt to the Court's satisfaction that the defendant has at least two prior felony convictions that may be used for determining the range and therefore the defendant is a Range 2 offender."

A "multiple offender" is defined, in pertinent part, as "a defendant who has received . . . [a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes . . . ." Id. § 40-35-106(a)(1). However, "[c]onvictions for multiple felonies committed as part of a single course of conduct within twenty-four (24) hours, constitute one (1) conviction for the purpose of determining prior convictions; . . . acts resulting in bodily injury or threatened bodily injury to the victim or victims shall not be construed to be a single course of conduct . . . ." Id. § 40-35-106(b)(4).

The Defendant argues that her prior three felony convictions were committed "as part of a single course of conduct," id., and that the trial court should have viewed them as one continuous criminal episode spanning from late April 1994 to May 4, 1994. In her brief, she states that "the 1994 convictions were continuous, victimized only one person and were done over a relatively short period of time." She therefore contends that she should have been sentenced as a Range I offender.

Clearly, the precise dates of the Defendant's three prior forgery offenses are crucial to our analysis of whether the convictions should be considered part of a single course of conduct. At the sentencing hearing, the State entered as exhibits three prior judgments of conviction for forgery up to $1,000 for which the Defendant pled guilty, but the judgments were not made part of the record on appeal. It is the duty of the appealing party to prepare a fair, accurate and complete record on appeal to enable meaningful appellate review. Tenn. R. App. P. 24(b). The Defendant has waived this issue for failure to provide this Court with a complete record on appeal. Id.; Tenn. R. Crim. P. 12(g); State v. Griffith, 649 S.W.2d 9, 10 (Tenn. Crim. App. 1982). Absent facts in the record to the contrary, we must presume that the Defendant's classification as a Range II offender was correct. See State v. Eldridge, 749 S.W.2d 756, 757 (Tenn. Crim. App. 1988).

Nevertheless, we are satisfied that at least two of the Defendant's prior offenses were separated by more than twenty-four hours. The Defendant testified at the sentencing hearing that her prior convictions arose from events occurring during the latter part of April and the early part of May in 1994, and in her brief, she states that the offenses at issue occurred between "the last day of April, 1994 and the 4th of May, 1994." Moreover, at the sentencing hearing, the State, as it did in its "Notice of Intent to Seek Enhanced Punishment," outlined the dates of the prior offenses as follows: The first offense was committed in April 1994; the second offense was committed on May 2, 1994; and the third offense was committed on May 4, 1994. Finally, the Defendant's presentence report indicates that on May 4, 1994, the Defendant was arrested for three counts of forgery up to $1,000, for which she was ultimately convicted. Regardless of the date on which the second offense occurred, the dates on which the first and third offense occurred are clearly separated by more than twenty-four hours. Because these two convictions are within the same class as the Defendant's present convictions, we conclude that they support the trial court's classification of the Defendant as a Range II offender. See Tenn. Code Ann. § 40-35-106(a)(1).

## B. LENGTHS OF SENTENCES

The Defendant also contests the lengths of her sentences. As previously stated, the Defendant pled guilty to ten counts of forgery, all Class E felonies. See id. § 39-14-114(c). The sentencing range for a Class E felony is between two and four years. Id. § 40-35-112(b)(5). The trial court sentenced the Defendant to three years, two months incarceration for each conviction.

In sentencing the Defendant, the trial court applied enhancement factor (1): "The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range . . . ." Id. § 40-35-114(1). In doing so, the court stated,

> In addition to the two charges that place the Defendant in the Range 2 category, the defendant also has a third charge which is in addition to that necessary to establish the appropriate range.
>
> The defendant also has a couple of misdemeanor convictions, an admission of drug usage which is also criminal activity or criminal behavior which the Court can consider as an enhancement factor.

See State v. Butler, 900 S.W.2d 305, 312 (Tenn. Crim. App. 1994) (basing application of enhancement factor (1) on the unlawful use of drugs). We conclude that the record supports application of this factor. The trial court gave this factor "considerable weight" because the Defendant had been previously convicted of the same offenses of which she was convicted in this case.

The trial court also applied enhancement factor (8): "The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community . . . ." Tenn. Code Ann. § 40-35-114(8). The trial court stated, "The record indicates that when the defendant first appeared before this Court in 1994 upon charges similar to this, that she was in fact upon probation when one of these offenses was committed." The court further stated,

Before the defendant was released from her community corrections program, the record reflects that – I believe she was released in November of 1996. Apparently the defendant was convicted of a major traffic offense. In my mind she was charged with driving on a revoked license but apparently pled guilty to the drivers license law which I presume is not driving on a revoked license. If in fact her license was revoked, and I assume [it] must have been or there wouldn't have been a charge, the defendant pled out to a lesser included offense, that was an offense committed while she was on community corrections since it was in August of 1996 and was not disposed of until December after she was released from community corrections. So she had a charge of driving on a revoked license and for some reason there was no revocation warrant taken out against her in the community corrections program.

So here is the series of events.

The defendant was given an 11 month and 29 day sentence; goes out and commits felonies while she in on that misdemeanor probation and she is not revoked. She does no time on the 11/29. She is given a two year . . . felony sentence [for forgery in 1994], and is charged with a major driving offense, driving on a revoked license, during that time and no revocation warrant so she escapes having to answer for failing to abide by the terms of release in the community in that case.

The presentence report supports these findings by the trial court. We therefore conclude that application of enhancement factor (8) is appropriate in this case. The trial court gave enhancement factor (8) "considerable weight," stating,

[D]efendant failed to abide by the conditions of release into the community and was given another chance by the Court in 1994. In less than 16 months, I believe was someone's calculation, she stands charged with similar offenses.

Counsel argues that the Court should consider that the defendant has been relatively free of crime for 16 months. Well, that is what we expect of people. We don't expect that you be free of crime for 16 months. We expect that you be free of crime for 16 and 20 and 30 and 40 and 50 and 60 and 70 years.

Based upon these factors, the trial court enhanced the Defendant's sentence to three years and four months for each count. Based upon mitigating factors, the trial court then reduced the Defendant's sentence to three years, two months for each count. The court applied mitigating factor (1), that "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury . . . .," id. § 40-35-113(1), but granted this factor little weight, stating, "[this] mitigating factor is present in all property crimes . . . ." However, we conclude that mitigating factor (1) in inapplicable in this case. State v. Jimmie Ramsey, No. 01C01-9903-CC-00072, 2000 WL 281653, at *3 (Tenn. Crim. App., Nashville, Mar. 10, 2000) (stating that "the mitigating factor for no serious bodily injury being either inflicted or threatened is not appropriate for the offense of forgery"). The trial court also considered mitigating factor (7), that "[t]he defendant was motivated by a desire to provide

necessities for the defendant's family or the defendant's self . . . ." Tenn. Code Ann. § 40-35-113(7). With regard to this factor, the court stated as follows:

> The defendant's argument might hold some weight or may have some weight with the Court with regard to counts 1, 2, 7 and 9 all of [which] involve checks that were written to food establishments. But not to 3, 4, 5, 6, 8, and 10. In some cases the defendant couldn't remember what necessities she was providing for her children. Certainly not any necessities to be had in a jewelry store; few necessities to be had in Sears or even Wal-Mart unless it is a Wal-Mart food store. There is not evidence in the record that those were food. The defendant did not remember them. There are no necessities to be had in applying for credit under a false name.
>
> Now, one could easily say . . . 60 percent of the criminal activity of the defendant had nothing to do with necessities.

The trial court considered and rejected several other mitigating factors proposed by the defense.

Upon review, we conclude that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record. Therefore, we may not modify the length of the Defendant's sentence. See Fletcher, 805 S.W.2d at 789.

## C. CONSECUTIVE SENTENCES

The Defendant next contests the imposition of consecutive sentences. The trial court ordered that the Defendant's sentences for counts one through five be served concurrently, but consecutive to the sentences for counts six through ten. The court further ordered that the sentences for counts six through ten be served concurrently, but consecutive to the sentences for counts one through five. The Defendant thus received an effective sentence of six years, four months incarceration.

It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds by a preponderance of the evidence that

> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;
>
> (3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity; the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7).

In this case, the trial court found that the Defendant had an extensive record of criminal activity, see id. § 40-35-115(b)(2), noting that she had committed thirteen felonies within less than five years. The record supports this finding by the trial court. We therefore conclude that the trial court did not err by ordering consecutive sentences in this case.

## D. ALTERNATIVE SENTENCING

Finally, the Defendant argues that she should have been granted some form of alternative sentencing. Tennessee Code Annotated § 40-35-102(5) provides as follows:

In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Id. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a).

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986)). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under

Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994).

The Defendant argues more specifically that as a possible alternative, the trial court could have granted her probation. "Although probation 'must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law.'" State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997) (citing Tenn. Code Ann. § 40-35-303(b) sentencing comm'n cmts). In determining whether to grant or deny probation, the trial court may consider the circumstances of the offense; the defendant's criminal record, background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

In denying an alternative sentence, the trial court noted, "As the State pointed out in this case, the Defendant now is not entitled to the presumption for alternative sentencing that she was entitled to in 1994." Measures less restrictive than confinement were applied unsuccessfully to the Defendant in 1994. See Ashby, 823 S.W.2d at 169; § 40-35-103(1)(C). Furthermore, we note the Defendant's history of committing forgery spanning from 1994 to 1998, her history of illegal drug use, and her prior misdemeanor convictions. We conclude that the evidence presented at trial supports the trial court's denial of alternative sentencing.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

-11-