**STATE of Tennessee, Appellee,**

**v.**

**Robert Earl SHELTON, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Oct. 15, 1992.

Permission to Appeal Denied March 22, 1993.

Ricky L. Jenkins, Sparta, for appellant.

Charles W. Burson, Atty. Gen., and Kimbra R. Spann, Sp. Asst. Atty. Gen., Nashville, William Edward Gibson, Dist. Atty. Gen., and James Horner and Ben Fann, Asst. Dist. Attys. Gen., Cookeville, for appellee.

## OPINION

TIPTON, Judge.

The defendant, Robert Earl Shelton, was convicted by a jury in the White County Criminal Court of second degree murder and was sentenced to twenty-two years in the Department of Correction. He appeals

as of right and makes the following contentions:

(1) The evidence was insufficient to show beyond a reasonable doubt that the killing was with malice.

(2) The trial court erred in excluding evidence of the deceased's threats against the defendant and his family and of the deceased's previous acts of violence.

(3) The trial court erred in refusing to instruct the jury as requested by the defendant regarding his mental condition and its relationship to malice.

(4) The trial court failed to give proper weight to existing mitigating factors in imposing the defendant's sentence.

The defendant was charged with the first degree murder of his estranged wife, Carolyn A. Shelton, on April 13, 1989. White County Deputy Allen L. Kirby testified that he took a telephone call at the sheriff's department from the defendant around 7:30 p.m., April 13, 1989. He stated that the defendant said that the deceased was coming over and that she had previously threatened to burn his house and his mother's trailer. The defendant said she was not there yet and Kirby told him to call back, if he saw a problem developing. Kirby stated that he told the sheriff about the call.

Kirby testified that he later received a report of a shooting and went to the defendant's residence. He said the defendant was calm and collected and that Charles Anderson, now White County Sheriff, was already on the scene. Sheriff Anderson testified that the defendant telephoned him at about 8:30 p.m. and said that he had just shot his wife who was in the driveway dead. When the sheriff arrived at the residence, the defendant came outside and told him the gun was inside on a table. The deceased was in the driver's side of the car in the driveway.

Investigation revealed that the deceased had been shot in the right side of the head, resulting in her death. Two empty shell casings were on the floorboard of the front passenger side of the car. A brown paper bag containing beer cans was in the car. The deceased had an odor of alcohol about her and the defendant's breath test, after 10:00 p.m., registered .07 percent. No incendiary material was found in the car.

Richard A. England, an investigator for the sheriff's department, testified that he videotaped the statement which the defendant gave. In the statement, the defendant said that the deceased's sister, Linda Davis, called him that afternoon and said that the deceased was going to burn his house down, as well as the trailer behind the house in which his mother and uncle lived. He said he called another of the deceased's sisters to confirm this. He then called the police.

The defendant stated that when the deceased arrived, he called the police again. The deceased told him that if he did not give her a divorce, she would burn the house and trailer down. The defendant said that they were talking in her car and that he shot her twice. The defendant stated that he "flipped out" about her going to kill his mother and burning them up in the trailer. He said he did not know if she had a weapon and he acknowledged that she was not threatening him with anything other than the burning. He said that he always carried a gun.

The defendant said he drank a six-pack of beer that day and that the deceased had been drinking. He talked about times when the deceased, in his opinion, was trying to set him up for something.

The deceased's sister, Hattie Sue Mulligan, testified that she talked to the defendant around 6:00 p.m. on the day her sister died. She stated that the defendant told her that the deceased was on her way over and that he would kill her when she pulled in. She said that the defendant had previously threatened to kill her sister. She denied ever hearing the deceased threaten the defendant. The deceased's brother, Earnest Miller, testified that about a week before his sister's death, the defendant said that no one would have her, if he could not.

The defense called Leeman Parker who was working at the jail at the time of the shooting. He verified that the defendant called around 6:15 p.m. and said that his

wife was coming up, threatening to burn his house down. Also, Parker stated that the defendant called around 7:15 p.m. and said that the deceased was there, "drunker than hell, raisin' hell." The defendant said that he did not want to get into trouble and asked Parker to send somebody. Also, the defendant's sister testified that the defendant always carried a gun around with him. She said that her eighty-five-year-old mother and her uncle lived directly behind her house where the defendant was staying.

The defense called two expert witnesses. Dr. Pamela Auble, a psychologist, testified that she tested and evaluated the defendant on June 15, 1990. She said the test results were consistent with brain damage and that the damage would result in the defendant not understanding people and having trouble coping with complicated situations. She said that the defendant would believe what people say as the truth, because he had no critical ability to evaluate the information. She stated that it was her opinion that the defendant thought he was defending his mother and uncle when he shot the deceased. Dr. Auble stated that the defendant was not insane, not "crazy," not incompetent, and not retarded, although he had a below average I.Q.

Dr. William Kenner, a psychiatrist, testified that he saw the defendant on May 14 and December 26, 1990. He said that the defendant had post-traumatic stress disorder from witnessing a fire on an oil rig in the 1970's in which people died. He was of the opinion that the defendant thought he was trying to protect his mother and uncle when he killed the deceased. He stated the deceased's threat of burning caused a dissociative state in the defendant who was not operating in a rational manner. However, he indicated that the defendant did not have an insanity defense and stated that the defendant was neither psychotic nor demented.

On rebuttal, the state called Dr. Samuel Craddock, a psychologist, and Dr. Steven D. Mullens, a psychiatrist, who had evaluated the defendant at Middle Tennessee Mental Health Institute from November 2 through December 4, 1989. Dr. Craddock stated that the defendant was competent to stand trial and was not insane. He said that the defendant did not emphasize the oil rig fire as playing any part in the shooting of the deceased. He acknowledged that the defendant had mild brain disfunction, but he stated that the defendant did not exhibit any symptoms of post-traumatic stress disorder. Also, he stated that the defendant suffered from impaired judgment and reasoning. Dr. Mullens testified that the defendant did not exhibit symptoms of post-traumatic stress disorder. He said that the defendant expressed extreme anger toward the victim and felt that she deserved being shot.

## I

The defendant contends that the evidence was insufficient to support a second degree murder conviction regarding the element of malice. He points to evidence tending, from his perspective, to discredit some of the state's witnesses and to the evidence submitted by the expert witnesses. On appeal, in determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This standard presumes that the jury has resolved any conflicts in the testimony, determined the credibility of the witnesses, and made all legitimate and reasonable inferences from the evidence in favor of the state. *See State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). We do not reweigh the evidence, but only determine its sufficiency as a matter of law under this standard.

The degree of homicide is a question for the jury's determination. *State v. Estes*, 655 S.W.2d 179 (Tenn.Crim.App. 1983). Also, malice, the element which differentiated second degree murder from manslaughter at the time of the offense, may be implied from all the circumstances of the case. *See* T.C.A. § 39–2–211 (re-

pealed 1989); T.C.A. § 39–2–221 (repealed 1989); *Farr v. State,* 591 S.W.2d 449, 451 (Tenn.Crim.App.1979). In this regard, malice can be inferred from the defendant's use of a deadly weapon. *State v. Martin,* 702 S.W.2d 560, 563 (Tenn.1985). In the light most favorable to the state, there is an abundance of evidence in the record from which any rational trier of fact could have found the existence of malice beyond a reasonable doubt. There is no merit to the defendant's contention.

## II

■ The defendant complains about the trial court's refusal to allow him to present two witnesses to the deceased's threats against the defendant and previous acts of violence. Carol Vincent, a friend and co-worker of the deceased, testified that the deceased told her that before it was all over, she would either kill the defendant or he would kill her. Vincent stated that she heard the deceased say that she wanted to get back with the defendant and that she would get him back if she had to burn him, his mother and his sister out. Vincent did not communicate these threats to the defendant.

An offer of proof was made regarding the testimony of A.J. Cullom who had previously been married to the deceased. The proof was that the deceased had pulled a gun on him, had previously told him that she had shot a previous husband, and said that she had killed another man.

The defendant contends that the testimony from these two witnesses was relevant to his claim that there was no malice involved with the killing. Obviously, the issue of malice deals with the defendant's state of mind. Threats against the defendant which were not communicated to him have no bearing on the defendant's state of mind and he was not entitled to elicit them before the jury. *See State v. Reynolds,* 666 S.W.2d 476, 479 (Tenn.Crim.App.1984). Also, the defendant does not contend that self-defense is at issue in the context of the deceased making a direct assault upon him. To the extent that Tennessee cases allow evidence of uncommunicated threats or previous acts of violence by a victim in order to establish who was the actual aggressor in an apparent affray, they, likewise, are irrelevant to the defendant's state of mind. *See State v. Furlough,* 797 S.W.2d 631 (Tenn.Crim.App.1990); *State v. Butler,* 626 S.W.2d 6, 11 (Tenn.1981); *Little v. State,* 65 Tenn. 491 (1873); Tenn. R.Evid. 404(a)(2). Therefore, the evidence sought to be introduced by the defendant was properly excluded.

## III

■ Next, the defendant contends that the trial court should have given the following instruction to the jury:

If you find that the defendant acted under an irresistible impulse, passion, or provocation produced by an insane delusion or mental disease or condition sufficient to destroy the defendant's faculty of perception, volition, or choosing then the idea of malice is negated and the defendant cannot be found guilty of murder.

If you find the defendant is not guilty of murder or if you have a reasonable doubt as to his guilt, then you must acquit him of this offense. You must then consider whether or not the defendant is guilty of voluntary manslaughter which is a lesser included offense.

The defendant asserts that he was entitled to the jury considering under this instruction his mental condition as it bore upon the question of the existence of malice, although he states that he is not relying upon an insanity defense. We note that the record reflects that the trial court did not instruct the jury on the defense of insanity nor did the defendant request such an instruction. In fact, the defendant told the jury in his opening statement that he was not relying on an insanity defense. Also, none of the witnesses gave an opinion that he was legally insane.

Although his brief is unclear, the defendant apparently contends that his brain damage and mental defects were sufficient to destroy his ability of perception in such a way that he had a delusion that the deceased's threats of burning constituted

an imminent peril. First, he notes that Tenn.R.Crim.P. 12.2(b) obligates a defendant to give notice to the prosecution of his intent "to introduce expert testimony relating to a mental disease or defect or *any other mental condition of the defendant bearing upon the issue of his guilt....*" He argues that this language indicates acknowledgement that Tennessee allows for the use of a mental condition defense to crime even if the condition does not constitute legal insanity.

Also, the defendant relies upon *Davis v. State,* 161 Tenn. 23, 28 S.W.2d 993 (1930) in which the court reversed a second degree murder conviction. The record reflected that the defendant, the town doctor, became obsessed with believing that his wife had improper relations with the victim, although the purported impropriety was wholly unfounded. The evidence of the obsession was such that the state conceded that the defendant "was possessed by an insane delusion" about the relationship. The court noted that the defendant was sane in all other respects and could distinguish the difference between right and wrong, the test for insanity which the court said stemmed from *M'Naghten's case,* 1 C. & K. 130, 8 Eng.Rep. 718 (House of Lords, 1843).[1] Also, it stated that absent the defendant being incapable to distinguish right from wrong, the fact that the defendant had an insane delusion or an irresistible impulse arising from the delusion to commit the act did not end his criminal responsibility therefor.

However, the court stated that "a homicide committed under an insane delusion is excusable, if the notion embodied in the delusion and believed to be a fact, if a fact indeed, would have excused the defendant." 28 S.W.2d at 996. From this premise, it reasoned that because voluntary manslaughter would have been the offense if the victim, in fact, had relations with the defendant's wife and the defendant, upon learning of it, had killed the victim while under the influence of the passion produced by the information, the defendant would only be guilty of voluntary manslaughter even if the passion were engendered by the insane delusion. The *Davis* rationale was cited with approval in *Overton v. State,* 165 Tenn. 575, 56 S.W.2d 740, 741 (1933).

The state contends that Rule 12.2 relates only to the defense of insanity and does not provide for a defense based upon the defendant's diminished mental capacity. It notes that Rule 12.2(b) refers to a defendant's mental disease or defect, a fundamental requirement for the insanity defense in Tennessee.[2] However, the state's brief does not address the holding in *Davis.*

We do not view Rule 12.2 as creating any defense not previously recognized in Tennessee. However, the state is taking too narrow a view of the Rule's impact. For instance, Tennessee recognizes that an accused's voluntary intoxication to the extent that he is deprived of the mental capacity to form specific intent is a defense to a charge involving a specific intent crime. *Harrell v. State,* 593 S.W.2d 664 (Tenn. Crim.App.1979). Under Rule 12.2(b), a defendant would be required to provide notice of his use of expert testimony regarding an intoxication defense even though it did not relate to legal insanity under the *Graham* test.

Actually, the jury instruction issue as raised by the defendant necessarily depends upon whether or not, at least in a homicide case, an abnormal mental condition not rising to the level of insanity may be used to negate the element of malice.

---

1. In *Graham v. State,* 547 S.W.2d 531, 539 (Tenn.1977), in which the *M'Naghten* test was abandoned, our Supreme Court noted that *M'Naghten* actually provided two tests for insanity, only one of which dealt with inability to know right from wrong. It stated that *M'Naghten* also provided the defense when the defendant did not know the nature and quality of his act.

2. In *Graham* our Supreme Court adopted the following test:

   A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

   547 S.W.2d at 543.

In other words, the defendant relies upon a diminished capacity defense.

Generally, the defense of diminished capacity allows a defendant to introduce competent evidence, usually expert testimony, of his impaired mental condition to show that he was incapable of forming a criminal intent, even though he was not insane. *See State v. Simmons*, 172 W.Va. 590, 309 S.E.2d 89, 98 (1983); 22 A.L.R.3d 1228 (1968). This Court has previously held, without explanation, that the defense of diminished capacity is not recognized in Tennessee. *State v. Taylor*, 645 S.W.2d 759, 763 (Tenn.Crim.App.1982); *State v. Croscup*, 604 S.W.2d 69, 72 (Tenn.Crim. App.1980). Given Tennessee precedent, this blanket statement is subject to dispute. Unquestionably, the defense of voluntary intoxication relies upon such a diminished capacity. Also, the holding in *Davis* indicated an acceptance of the proposition that an abnormal mental condition short of insanity, as then defined, could be used to negate the state of mind elements, including malice, required for first or second degree murder.[3]

In *State v. Thornton*, 730 S.W.2d 309 (Tenn.1987), our Supreme Court discussed *Davis* and noted that it was an unusual case in which the charge was reduced to voluntary manslaughter because of an insane delusion. Significantly, the Court did not criticize the *Davis* holding. Further, in *State v. Taylor*, 771 S.W.2d 387 (Tenn. 1989), a first degree murder case, the defendant, citing *Davis*, asserted that he was entitled to the giving of his requested instruction to the effect, according to him, that even though not insane, he could be guilty of a lesser offense if mental impairment made him unable to develop the necessary elements of malice and premeditation. The Supreme Court stated that "[t]his is the so-called limited defense of diminished capacity, which it is commonly said is not recognized in Tennessee," citing this Court's earlier *Taylor* decision. 771 S.W.2d at 398. However, the Court did not

state that it would not recognize such a defense, but instead determined that the defendant's requested instruction did not "directly concern this defense." *Id.* It held that the trial court, otherwise, fully charged the jury on all the elements of murder and lesser included offenses and, thus, the jury was not precluded from finding the defendant guilty of a lesser offense. We view the Supreme Court's statements in *Taylor* as less than a ringing endorsement of this Court's blanket rejection of the diminished capacity defense and we view *Davis* as having continued vitality.

However, even applying *Davis* to this case, it was not error to refuse the defendant's requested instruction. It was confusing and did not limit the jury's inquiry to the rule in *Davis*. In effect, the instruction, written in the alternative, told the jury to acquit the defendant of second degree murder if the defendant acted under passion or provocation produced by a mental condition which destroyed his faculty of perception. Yet, not all passion or provocation negates malice, not all mental conditions involve disease or defect, nor does lack of perception necessarily exclude the intent to kill maliciously.

*Davis* must be read in light of the change in the insanity standard mandated in *Graham v. State*. Under the *Graham* test, the cornerstone of a defense to homicide under *Davis* must be that the defendant's state of mind at the time of the offense had to be the product of a mental disease or defect, not just any mental condition. If the mental disease or defect produced a delusion and the notion embodied in the delusion and believed to be a fact would have excused the defendant's conduct if the notion were indeed a fact, then the conduct committed under such a delusion is, likewise, excusable. In this case, the requested instruction did not limit the jury's consideration to whether or not there was a mental disease or defect existing in the defendant which produced a delusion in the defendant that he or his family was in

---

**3.** With voluntary intoxication, our refusal to allow it to negate the element of malice does not stem from a belief that intoxication cannot negate the mental state necessary for malice. Rather, the refusal arises more from a judicial

policy that persons should not be allowed to escape punishment for a homicide when they voluntarily ingest alcohol which renders them drunk. *See Atkins v. State,* 119 Tenn. 458, 105 S.W. 353 (1907).

imminent peril from the deceased or was so threatened by her which, if in fact the peril or threat existed, would have created such passion or provocation as to negate the existence of malice.

Given the evidence in this case and the defendant's disavowal of an insanity defense, the trial court was under no obligation to instruct the jury on the defendant's state of mind other than it had already done regarding the elements of the two degrees of murder, voluntary manslaughter and involuntary manslaughter. Otherwise, the trial court will not be held in error in refusing to give an incorrect special instruction. *State v. Moffett,* 729 S.W.2d 679, 681 (Tenn.Crim.App.1986).

## IV

■ As to sentencing, the defendant complains that the trial court failed to give proper weight to existing mitigating factors. The defendant was convicted of a Class A felony and sentenced as a Range I offender, a status which provides a sentencing range of fifteen to twenty-five years. T.C.A. § 40–35–112(a)(1). In sentencing the defendant to twenty-two years, the trial court gave great weight to the enhancing factor relating to the defendant's extensive criminal history and, also, relied on the defendant's past actions which indicated an unwillingness to obey the law when previously released into the community. *See* T.C.A. § 40–35–114(1), (8). The record reflects that the defendant had previously been convicted of passing a forged instrument, a serious felonious assault, and several public drunkenness offenses. It refused to consider the use of a firearm as an enhancing factor, believing that it was an element of the crime.

As to mitigating factors under T.C.A. § 40–35–113, the trial court rejected (2) and (3), dealing with the defendant acting under strong provocation and having substantial grounds to justify his conduct, finding that the deceased's conditional threat about a divorce or burning the house and trailer did not give rise to their application. As to (8), relating to a mental condition that significantly reduces culpability, the trial court stated that the jury took this into consideration in acquitting the defendant of

first degree murder. It further added that it was not sufficiently persuaded by the proof that the factor existed to mitigate the second degree murder. Also, it refused to apply (11) regarding the offense being committed under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the defendant's conduct. It stated that there had been "substantial trouble between the parties" and that no second degree murder is committed with a sustained intent to violate the law.

■ On appeal, the review of a sentence is *de novo* on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40–35–401(d). The weight afforded an existing enhancing or mitigating factor is left to the trial court's discretion based upon the record before it. T.C.A. § 40–35–210, Sentencing Commission Comments; *see State v. Moss,* 727 S.W.2d 229, 238 (Tenn.1986). If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls. *See State v. Ashby,* 823 S.W.2d 166, 169 (Tenn.1991).

Generally, we view the record to support the trial court's findings except that it incorrectly ignored the use of a firearm as an enhancement factor because such a use is not an element of second degree murder. Also, the trial court should have applied mitigating factor (11) because, although there were continuing domestic difficulties, there was no finding by the court that the difficulties related to a sustained intent to violate the law which motivated the killing. However, in assessing the relative weight to be given the additional enhancement factor and mitigating factor, we determine that a twenty-two-year sentence remains appropriate.

In consideration of the foregoing and the record as a whole, the judgment is affirmed.

SCOTT, P.J., and PEAY, J., concur.