IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 15, 2002 Session

## STATE OF TENNESSEE v. ALDA MICHELLE PAETZ

**Direct Appeal from the Circuit Court for Cheatham County**
**No. 13529      Robert E. Burch, Judge**

---

**No. M2001-01012-CCA-R3-CD - Filed March 19, 2002**

---

The Defendant entered a plea of nolo contendere to vehicular homicide by reckless driving. Pursuant to her plea agreement, the Defendant received a four-year sentence, with the manner of service of the sentence to be determined by the trial court. Following a sentencing hearing, the trial court ordered that the Defendant serve her entire four-year sentence in the Tennessee Department of Correction. The Defendant now appeals, arguing that she should have received some form of alternative sentencing. We conclude that the record supports the trial court's denial of alternative sentencing and therefore affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Jefre S. Goldtrap, Nashville, Tennessee, for the Appellant, Alda Michelle Paetz.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Robert S. Wilson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On February 7, 2000, the Cheatham County Grand Jury indicted the Defendant, Alda Michelle Paetz, for one count of vehicular homicide by intoxication, see Tenn. Code Ann. § 39-13-213(a)(2), and for one count of vehicular homicide by reckless driving, see id. § 39-13-213(a)(1). The State subsequently made a motion to nolle prosequi count one of the indictment, vehicular homicide by intoxication, and the trial court granted the motion. On February 21, 2001, the Defendant entered a nolo contendere plea to the charge in count two of the indictment, vehicular homicide by reckless driving. Pursuant to her plea agreement, the Defendant received a sentence of four years.

On March 21, 2001, the trial court conducted a sentencing hearing to determine the manner of service of the Defendant's sentence. At the conclusion of the hearing, the trial court denied alternative sentencing and ordered that the Defendant serve her entire sentence in the Tennessee Department of Correction. The Defendant now appeals her sentence, arguing that the trial court erred by denying alternative sentencing and ordering her to serve her sentence in confinement.

The facts underlying the Defendant's conviction are as follows: On November 6, 1999, the Defendant and her mother were involved in an automobile accident which resulted in the death of the Defendant's mother. The Defendant was driving at the time of the accident.

The following evidence was presented at the Defendant's sentencing hearing: Deborah Vance, a probation officer, testified that she prepared the Defendant's presentence report. Vance reported that the Defendant was a forty-year-old female who had completed high school and stated that the victim in this case was the Defendant's mother. Vance testified that she interviewed the Defendant, who insisted that she had done nothing to cause the accident. She also presented a victim's impact statement submitted by the Defendant's brother, who was unable to attend the sentencing hearing because of health problems. Vance stated that based on her investigation, she recommended three enhancement factors: that the Defendant had a history of criminal convictions or behavior, that the Defendant abused a position of private trust in facilitating the offense, and that the crime was committed under circumstances under which the potential for bodily harm was great. See Tenn. Code Ann. § 40-35-114(1), (15), (16).

With regard to the Defendant's prior criminal record, Vance testified that the Defendant pled guilty on February 1, 2001 to simple possession of cocaine, for which she received eleven months and twenty-nine days probation. She stated that the Defendant also pled guilty in 1998 to attempt to commit a felony, for which she received eleven months and twenty-nine days, suspended; Vance reported that the Defendant had successfully completed probation for this conviction. Vance also noted that the Defendant's record included several other charges that had been dismissed.

Vance testified that the Defendant has a history of psychiatric treatment. The Defendant reported in the presentence report that she had once attempted suicide in 1996. Vance also testified that the Defendant was under the care of both a doctor and a dentist at the time of the sentencing hearing. With regard to the Defendant's health, Vance testified that the Defendant had been diagnosed with pleurisy, lupus, and hepatitis C. In addition, she noted that the Defendant had sustained nerve damage to her shoulder from the accident that resulted in her conviction. The Defendant also told Vance that she had some liver damage and that she needed bladder surgery. Vance stated that the Defendant reported that she had been hospitalized three times since the accident and that she had been diagnosed with severe depression and posttraumatic stress disorder. The Defendant also informed Vance that she had short-term and long-term memory loss. Vance stated, however, that the Defendant seemed to have a selective memory and testified that the Defendant was able to recall the accident.

Vance further testified that the Defendant had a history of drug use and stated that the Defendant had attended several drug rehabilitation programs. The Defendant informed Vance that she had completed a forty-five-day treatment program specializing in cocaine therapy, although Vance was unable to verify this information. Vance stated that the Defendant also reported a relapse with cocaine "[t]hat would have overlapped [the Defendant's reportedly] successful treatment . . . ." Vance stated that she "had trouble with the dates" that the Defendant provided and indicated that she was therefore unsure of the accuracy of the information provided by the Defendant for the presentence report. Vance stated that the Defendant was living at a halfway house a few months prior to the sentencing hearing, but that the Defendant "totally denied [having] drug problems" at that time. According to Vance, the Defendant claimed that she last used medication on the afternoon prior to the vehicle accident that resulted in her mother's death.

Vance testified that both of the Defendant's parents were deceased and that the Defendant had a poor relationship with her remaining family. Vance stated that the Defendant's "family and other relatives blame her for the accident" and reported that the Defendant "has little or no contact with them." Vance stated that the Defendant told her that she lived with the knowledge "that she was driving the car that took her mother[']s life." However, Vance testified that the Defendant "expressed numerous times that she felt like her mother had had a stroke at the time [of the accident]," despite the fact that the autopsy performed on the Defendant's mother indicated that her death was a result of trauma from the automobile accident. Vance testified, "[The Defendant] went on to describe [her] mother grabbing the steering wheel. And she really felt like, because of the way her mother was looking at her, not hearing, that she felt like her mother was having a stroke."

Finally, Vance stated that the Defendant was not working at the time of the sentencing hearing. She testified that the Defendant last worked three years prior to the hearing as a dental assistant at the Oral Surgical Institute.

On cross-examination, Vance testified that the Defendant was cooperative during her interview for the presentence report, stating that the Defendant provided a great deal of information for the report. Vance also reported that the Defendant completed a one-year course at Nashville Tech to become certified as a dental technician, which led to employment in the dental field. Vance stated that she understood that both lupus and hepatitis C were "lifetime disease[s]" and that she assumed that the Defendant's illnesses impacted the Defendant's employment as a dental assistant. Finally, Vance noted discrepancies in the statements that the Defendant had made about the accident in this case; she stated, "When I was interviewing [the Defendant], . . . . [s]he was adamant that her mother had a stroke. And, then, the Vanderbilt reports . . . said . . .that the mother had grabbed the steering wheel because she felt like the daughter was going across the yellow lines."

Donald Lee Binkley, a state trooper, testified that he investigated the automobile accident that resulted in the victim's death in this case. He recalled that when he arrived at the scene, he "observed the vehicle up against a tree with substantial damage to the front end." Binkley explained a diagram of the scene that was constructed by an accident reconstructionist. He stated that the diagram indicated that the car driven by the Defendant drove off the road and over a curb, causing

one of the tires to explode, and the vehicle then drove over a second curb and into a ditch. The car came to rest after colliding with a tree. Binkley testified that from the time that the vehicle veered off the road to the time that it came to a stop, it traveled 158 feet. He reported that the speed limit where the accident occurred was thirty-five miles per hour, and he emphasized that the vehicle driven by the Defendant "had to be going in excess of thirty-five (35) miles an hour." Binkley summarized his impressions of the accident as follows:

> I know this is a . . . family situation . . .; but there's no way, beyond a doubt, that I . . . would have thought that this crash would have resulted from nobody not acting in a[n] impaired or reckless manner, due to the fact that . . . the road is straight, it's a thirty-five (35) mile speed limit, . . . it's a state highway. The road is over twenty (20) feet in width, both lanes. And [I don't understand] how it could happen, other than somebody behaving in a reckless or impaired manner.

Binkley testified that the Defendant's mother was transported by ambulance from the scene before he arrived. Binkley stated that he was told when he arrived at the scene that the passenger of the car had died. He reported that an autopsy performed later on the Defendant's mother revealed that she had died as a result of the automobile accident, not from a stroke, as the Defendant maintained.

Binkley testified that when he arrived at the scene, he observed the Defendant lying on the ground on a gurney. He ordered blood tests done on the Defendant, and results of the tests revealed that the following drugs were in the Defendant's blood at the time of the accident: barbituates, Diazepam, Oxazepam, cocaine metabolites, and opiates. Binkley testified that he also found several marked prescription bottles and "possibly one unmarked" prescription bottle in the vehicle. One of the bottles contained morphine, a Schedule II substance; Binkley reported that "[a]s [he] underst[oo]d it," the morphine had been prescribed for the Defendant's dental problems. Other bottles contained Diazepam, Lorazepam, and Clonazepam, all Schedule IV substances.

On cross-examination, Binkley stated that he was not an accident reconstructionist. He also clarified the results of the blood tests performed on the Defendant on the day of the accident: He stated that the first "cocaine screen" results were "presumptive positive," but stated that later results indicated that cocaine was not found in the Defendant's bloodstream. However, Binkley explained that insufficient quantities of the Defendant's blood were sent to the lab, and the lab therefore "didn't have enough sample to test for each individual drug." Finally, Binkley testified that the Defendant gave a statement to police officers after the accident that she was given eight injections of a pain medication by her dentist less than forty-eight hours prior to the accident. However, he admitted that the Defendant may have told officers that she received the injections four days prior to the accident, stating, "I could be wrong on that . . . . I'd have to look at the paperwork . . . ."

Paulette Pugh, a freelance paralegal, testified that she had know the Defendant since the Defendant's birth and stated that she and the Defendant were close friends. She testified that the Defendant and her mother were "extremely close. Much closer than most mothers and daughters." She maintained that she had never seen the Defendant act abusively towards her mother, and she

recalled that the Defendant and her mother cared for one another during times of illness. Regarding the automobile accident, Pugh testified, "There's not a day that goes by that [the Defendant] doesn't think about it, that she's lost her mother. Her mother was her best friend . . . ." Pugh stated that she and the Defendant had visited the grave of the Defendant's mother several times since the accident. Pugh also testified that the Defendant had had a very close relationship with her father, but stated that the Defendant and her brother had a poor relationship.

On cross-examination, Pugh testified that she was not aware of any medication that the Defendant was taking, although she recalled that the Defendant "told her about an oral surgery" that she was scheduled to have prior to the accident. However, Pugh testified that she was aware that the Defendant had been to "a rehab center" twice for help with a cocaine habit.

Kelly Billingsley testified that he had known the Defendant for fifteen or sixteen years. He characterized the Defendant's relationship with her mother as "[l]oving, fun, [and] sweet." Billingsley also testified that the Defendant had expressed remorse and sadness about the accident.

The Defendant also took the stand at the sentencing hearing. She testified that she was last employed as an oral surgical assistant for the Oral Surgical Institute. The Defendant stated that her employment, however, had been affected by her poor health. She stated that she contracted hepatitis C by picking up an uncapped syringe while working as a surgical assistant. She testified that she had also been diagnosed with lupus and osteomyelitis, "an infection of the bone," which had resulted in the loss of her teeth and the removal of a portion of her lower right jaw bone. She stated that all three illnesses with which she had been diagnosed were chronic and that over the years she had been prescribed increasing amounts of medication, including pain medication, for her health problems. The Defendant reported that during her illnesses, her mother had helped her: She stated that her mother transported her to and from doctors' appointments, had her medication filled, and helped feed her following her surgery. The Defendant also reported that her mother transported her to and from her drug rehabilitation program.

The Defendant testified that her mother had also suffered from health problems. She reported that her mother had diverticulitis, and she stated that she helped her mother when her mother was ill. The Defendant testified that she lost her father in 1992 to congestive heart failure and that she lived with her mother from the time of her father's death. She testified, "My mother had a hard time, as I did, dealing with my father's death. We were company for one another. My mother helped strengthen me and I helped strengthen, I believe, my mother. My mother was a good Christian woman. . . . She taught me about God." The Defendant described her mother as her "best friend" and her confidante. The Defendant reported that she had visited her mother's grave often since her mother's death. She stated that she would experience the pain of her mother's death "until the day [she] die[s]."

The Defendant reported that the car she was driving at the time of the accident belonged to her mother. She stated, "[T]he accident was the first time I had ever driven that car." She maintained that she did not believe that her mother "would have ever gotten in the car . . . that

morning" if her mother had feared for her safety at her daughter's hands. On cross-examination, the Defendant maintained that she was driving at a speed of fifteen miles per hour at the time of the accident and that she "only hit one . . . concrete curb." She also stated, "I will believe till [sic] the day I die my mother was having a stroke [at the time of the accident]." She testified that she believed her mother was having a stroke at the time of the accident because "her eyes were bulged . . . [and] set" and because "she never screamed."

The Defendant testified that she was no longer using cocaine at the time of the sentencing hearing, but reported that she was still taking prescription medication. She reported that she took "Effexor . . . . for severe depression, posttraumatic syndrome," and "two . . . mood stabilizers a day," one of which was prescribed for seizures that the Defendant reported having since the time of the accident. With regard to the pill bottles found in her mother's car after the accident, the Defendant testified that the "Clonazepam [tablets] were not in [her] purse at the time." She testified that her doctor had also prescribed morphine and Diazepam, but stated that "[t]he pharmacy had not filled all the medication . . . ." She admitted, however, that she had taken some morphine tablets and that she was also taking Valium at the time of the accident, but she denied taking any Lortabs at that time. The Defendant further testified that during the week prior to the accident, she underwent surgery, and she stated that she was prescribed and ingested the following medications during the week prior to the accident: Demerol, Valium, Seconal, Ativan, and Phenergan. However, she denied having ingested these medications immediately before the accident, stating, "The prescriptions were given to my mother to have filled." Nevertheless, the Defendant denied being addicted to prescription medication or to any other substances.

Finally, the Defendant discussed two recent charges on her record, a paraphernalia possession charge, which was later dismissed, and a charge for possession of cocaine, to which she pled guilty. With regard to the first charge, the Defendant testified that one of her girlfriends visited the motel where the Defendant was then living. According to the Defendant, police followed the friend to the motel and found "crack" cocaine and a "crack pipe" on the friend's person; the Defendant denied possessing any drugs or drug paraphernalia on this occasion. With regard to the second charge, the Defendant testified that three months later, she was staying in a halfway house, and her roommate "drop[ped] his crack [cocaine] in the couch or the chair," where it was later found by police. Counsel for the State pointed out to the Defendant that the owner of the halfway house told a judge that he overheard the Defendant having a phone conversation, during which she reportedly stated, "Yeah, we still got the crack, we're bagging it . . . up right now. We sold a little of it and we're still good on your money." The Defendant again denied possessing any drugs or drug paraphernalia at the time, but stated that she pled guilty to simple possession.

Finally, the Defendant testified that she had a poor relationship with her brother and his son. She stated that she lived in a motel after her mother's death because she "didn't have a home." She recalled that her brother told her that she "could live under a bridge." The Defendant further testified that she was "with Metro Mental Health Co-op" and that she had seen a psychiatrist three times. She reported that she and her case worker were "looking into" long-term housing at the time of the

sentencing hearing and that her case worker had "already helped [her] . . . with her food stamps."

The Defendant now challenges on appeal the trial court's order that she serve her entire four-year sentence in the Tennessee Department of Correction. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have

preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

Specifically, the Defendant argues that she should have been granted some form of alternative sentencing. Tennessee Code Annotated § 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a). The Defendant, as a standard offender convicted of a Class C felony, see Tenn. Code Ann. § 39-13-213(b), is presumed to be a favorable candidate for alternative sentencing.

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing Moss, 727 S.W.2d at 235). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994).

The Defendant more specifically argues that she should have been granted some form of split confinement or probation. In determining whether to grant or deny probation, the trial court may consider the circumstances of the offense; the defendant's criminal record, background and social

history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

In sentencing the Defendant, the trial court considered the Defendant's prior criminal record, which consisted of two prior convictions. The court thus determined that enhancement factor (1) was applicable in this case. See Tenn. Code Ann. § 40-35-114(1). The court also noted that the Defendant "did well on her probation" while being supervised by a "tough[]" probation officer. The court then considered mitigating factors and concluded that mitigating factor (11), that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," id. § 40-35-113(11), was also applicable. He concluded that this factor was "a very large factor in [the Defendant's] favor."

The trial court also made the following comments at the conclusion of the sentencing hearing:

This defendant is untruthful. There is no way that she could have been doing fifteen (15) miles per hour. Absolutely no possible way for that car to leave the road, jump two (2) curbs, go through a ditch for over a hundred (100) feet with a flat tire, impact a tree or telephone pole with force sufficient to cave the bumper back to the front wheel. It couldn't have happened that way. . . . The more likely possibility is the defendant was not paying attention, was distracted or something of that nature and . . . left the road . . . at a pretty good clip coming down through there. . . . But that's not before the Court, that's just speculation on my part. But I can't make a ruling on that.

The Court finds this defendant to be manipulative. During most of her testimony, she wept. Not a single tear. No moisture whatsoever. Twenty-one (21) years, I've never seen that. Never seen anybody able to cry without tears, unless they were faking it. Her numerous explanations concerning the various scrapes that she's been into, nothing is ever her fault, never faced up to anything. . . . [S]he's in denial.

The court then ordered that the Defendant serve four years in the Tennessee Department of Corrections, with the balance of the sentence to be suspended after service of two years. Counsel for the Defendant, however, pointed out that Tennessee Code Annotated § 40-35-306 (a), governing split confinement, states that "[a] defendant receiving probation may be required to serve a portion of the sentence in continuous confinement for up to one (1) year in the local jail or workhouse, with probation for a period of time up to and including the statutory maximum time of the class of the conviction offense." Tenn. Code Ann. § 40-35-306(a) (emphasis added). Because the court had sentenced the Defendant to serve two years in confinement, a term exceeding the maximum time allowed by Tennessee Code Annotated § 40-35-306(a), the trial court reconsidered its decision. The judge stated, "I would be perfectly willing to suspend it after two (2) years. But I do not think that one (1) year would be sufficient. Therefore, [the Defendant's] sentence is four (4) years in the state

penitentiary to be served." The trial court correctly determined that a sentence of two (2) years of "split confinement," followed by two (2) years of probation would not be a legal sentence in this case.

Because the trial court thoroughly considered the sentencing principles and all relevant facts and circumstances, our review in this case is <u>de</u> <u>novo</u> with a presumption of correctness. After review, we conclude that the record supports the sentence imposed. The trial court found that the Defendant has a criminal history and is untruthful. The Tennessee Supreme Court has held that a defendant's lack of candor or untruthfulness reflects poorly on a defendant's potential for rehabilitation and thus supports the denial of probation. <u>See</u> <u>State v. Neely</u>, 678 S.W.2d 48, 49 (Tenn. 1984); <u>see</u> <u>also</u> <u>State v. Nunley</u>, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); <u>State v. Zeolia</u>, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996). Furthermore, our supreme court has held that a defendant's failure to acknowledge culpability for his or her actions may also support a finding that a sentence of confinement is necessary to avoid depreciating the seriousness of an offense. <u>See</u> <u>State v. Gutierrez</u>, 5 S.W.3d 641, 647 (Tenn. 1999); <u>see</u> <u>also</u> <u>State v. Thomas Wayne Shields</u>, No. W2000-01524-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 18, at *27 (Tenn. Crim. App., Jackson, Jan. 4, 2000); <u>State v. Donald Paul Presley</u>, No. E2000-00592-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 629, at *24 (Tenn. Crim. App., Knoxville, Aug. 14, 2001). For these reasons, we conclude that the presumption of alternative sentencing was sufficiently rebutted in this case and that the trial court thus did not err by imposing a sentence of confinement.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

-10-