IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 20, 2002

## STATE OF TENNESSEE v. TONY DEAN MORGAN

**Direct Appeal from the Circuit Court for Blount County**
**No. C-13156-57     D. Kelly Thomas, Jr., Judge**

**No. E2001-02924-CCA-R3-CD**
**October 23, 2002**

The Defendant pled "no contest" to aggravated assault and assault. Pursuant to the plea agreement, the Defendant received concurrent sentences of three years for the aggravated assault conviction and eleven months and twenty-nine days for the assault conviction, for an effective sentence of three years. The manner of service of the sentence was to be determined by the trial court. Following a sentencing hearing, the trial court ordered that the Defendant serve his entire sentence in the Tennessee Department of Correction. The Defendant now appeals, arguing that the trial court erred by ordering him to serve his sentence in confinement. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

George H. Waters, Assistant Public Defender, Maryville, Tennessee, for the appellant, Tony Dean Morgan.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; Michael L. Flynn, District Attorney General; Kirk E. Andrews and Edward P. Bailey, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I. FACTS

The following facts were adduced at the Defendant's sentencing hearing: Officer Randall Ailey of the Blount County Sheriff's Department testified that he and Officer Angie Condee responded to a 911 call concerning a fight which involved knives at 627 Reservoir Road in Blount County. Ailey recalled that when he arrived at the scene, the Defendant, who was "obviously intoxicated," was standing in the driveway flagging him down. Ailey testified that he spoke with the Defendant and ascertained that he had been fighting with his cousin. According to Ailey, the

Defendant stated that the fight had occurred during a card game in which he said that his cousin had been cheating. Ailey testified that the Defendant told him that he and his cousin got into a "fist fight," but that no knives were involved. Ailey reported that it was obvious that the Defendant had been in a fight because his lip was bleeding and because he had bruises on his face. Ailey stated that when he arrived at the scene, the Defendant's cousin was standing around the corner of a nearby trailer. Ailey attempted to find the cousin, but was unable to locate him.

Officer Ailey testified that he then entered the Defendant's trailer and noticed a loaded .22 rifle laying beside the door. Ailey reported that he unloaded the rifle and laid it on the couch. He testified that the Defendant, who was "very irate," told him that he was going to use the gun to kill his cousin. Ailey recalled that Officer Condee arrived immediately after he unloaded the rifle. Ailey testified that he continued to talk to the Defendant while Condee searched for the Defendant's cousin. Ailey stated that Condee found the cousin "passed out" in a nearby field. Ailey testified that he and Condee were preparing to put the cousin into the police vehicle when Officer Yoakum arrived.

Ailey testified that as they were passing by the Defendant's trailer to put the cousin into the police car, he observed the Defendant walk by the front door carrying a compound bow. Ailey recalled that the Defendant had the bow in his left hand and an arrow in his right hand. According to Ailey, the Defendant again made threats to kill his cousin with the .22 rifle. Ailey stated that he then entered the Defendant's trailer with his gun in a "ready position." He testified that as he rounded a corner in the trailer, he saw the Defendant draw the bow back with an arrow. Ailey explained that the Defendant had the bow, which was just two or three feet from Ailey, aimed directly at Ailey's chest. Ailey stated that he ordered the Defendant several times to drop the bow, and then Ailey kicked it out of the Defendant's hands.

Ailey testified that he and Condee were then able to get the Defendant on the ground. Ailey stated that the Defendant continued to resist arrest and that the Defendant hit Condee on the right side of her face. Ailey recalled that he and Condee continued to struggle with the Defendant for another fifteen or twenty seconds before they were able to handcuff him. The Defendant was then placed in the police cruiser.

On cross-examination, Ailey testified that he did not know what happened to the arrow that had been in the bow. He stated that it must have discharged because it was not on the ground with them during the struggle, but he did not think it caused any damage. Ailey reported that the Defendant had the bow pulled back "at least seventy-five percent." He stated that the Defendant did not say anything or make any threats while he was holding the bow. Ailey testified, "I guess he was surprised to see me." Ailey stated that the Defendant had the bow pointed at him for three or four seconds before Ailey kicked it out of his hands. He recalled that after subduing the Defendant, Ailey asked him "what he thought he was doing," but the Defendant did not respond. Ailey was not sure if the Defendant knew that his cousin was in custody.

Ailey testified that someone other than the Defendant made the 911 call. He believed that the card game was in a third party's trailer and that third party actually made the call. Ailey testified that the Defendant was moderately intoxicated when he arrived at the scene. Ailey recalled that the Defendant had "slurred speech," was "unsteady on his feet," and was "sort of weaving." According to Ailey, the Defendant said that he was angry at his cousin. Ailey testified that he unloaded the gun in the Defendant's presence.

The Defendant testified that he lives at 627 Reservoir Road in Blount County with his girlfriend of five months, Valerie Johnson. He stated that his mother, Katie Franklin, lives next door. The Defendant testified that at the time of the sentencing hearing, he was taking five different kinds of medication in accordance with doctor's orders. He reported that the medications were first prescribed approximately three months earlier. The Defendant testified that he receives a monthly Social Security disability check based on his bipolar disorder. He stated that his mother is the guardian of his Social Security checks.

The Defendant acknowledged that he had been charged with several misdemeanor offenses relating to alcohol in the 1980's and continuing until 1994. The Defendant testified that approximately one or two weeks after the events in this case, he called the "Crisis Unit." He stated that he was then admitted to Peninsula Hospital, where he stayed for seven days until he was evaluated. The Defendant testified that he was diagnosed with a bipolar disorder.

The Defendant testified that at the time of the hearing, he had not committed any offenses since those that are the subject of this case. He also testified that he no longer had any weapons in his home. The Defendant stated that he quit drinking but admitted drinking a beer "on occasion." He reported that prior to December 2000, he typically drank one or two "fifths" of liquor a week. However, he claimed that since that date, he had drunk a total of "maybe three beers" and no liquor. The Defendant also submitted to a drug screen on May 22, 2001, which yielded negative results.

The Defendant stated that before this incident, he was "basically . . . killing [himself] . . . [w]ith the drinking." He explained, that "[a]ll [he] wanted to do before was die." However, the Defendant testified that he now has a better outlook on life. He stated that now when he feels depressed, he "find[s] something to do in the yard, or . . . play[s] a video game . . . [or] lift[s] weights." The Defendant admitted that he still has the urge to drink, but he refrains from doing so.

Regarding the events in this case, the Defendant testified that he was in a friend's trailer listening to music, when "for no reason at all [his] cousin just jumps up out of his seat and starts a fight with [the Defendant]." The Defendant testified that he punched his cousin in the face, and his cousin punched him in the face. He stated, "Next thing I know a knife's drawn." The Defendant testified that his friend was able to convince his cousin, Ron, to leave, and then the Defendant called the police. The Defendant stated that he waited at his friend's trailer for the police to arrive.

The Defendant admitted that he had drunk approximately a fifth of liquor plus several beers on the day of the crimes in this case. He stated, "The only thing I remember is being at home and

next thing I know there's three or four officers standing in my living room with guns drawed." The Defendant claimed that he did not know what happened with regard to the bow and the officers, but he "believe[d] he was startled." He stated, "I remember attempting to put the bow up and next thing I know there's officers with guns drawed." The Defendant claimed that he did not remember speaking to the officers before they had their guns drawn. He admitted being angry with his cousin, but he claimed that he did not intend to harm any officers. The Defendant testified that the gun that Officer Ailey found was not loaded. The Defendant stated that he had the shells in his pocket.

The Defendant testified that his mother provides him with transportation and that his brother, Dewayne, sometime helps. The Defendant stated that he sees his brother "maybe once a week." The Defendant testified that his medication has "leveled [him] out." He stated that his mother, who is fifty-four years old, insures that he takes his medication regularly. The Defendant testified that he is not a "mean person," but that he just made a mistake.

On cross-examination, the Defendant testified that he remembered "having" the bow when the officers entered the trailer, but he stated that he did not remember drawing the bow. He also testified that he did not remember loading the gun or Officer Ailey unloading it. The Defendant claimed that he did not remember saying that he wanted to kill his cousin, although he stated that he remembered being angry at his cousin. When asked if he intended to kill his cousin, the Defendant replied, "May be." The Defendant testified that although he ordinarily stored his bow in a "custom container" in his bedroom, the bow was out of its container because he had been shooting at targets in his yard earlier that day. The Defendant recalled that on the day of the offense, he was not on medication, but admitted that he had consumed "whiskey and beer."

The Defendant acknowledged that he was convicted in 1998 of assault, for which he received probation. He stated that he attended a class on managing emotions as part of his probation. In addition, the Defendant admitted that he assaulted his wife on another occasion, but he reported that he believed that the case had been dismissed. He testified that he was convicted in 1994 for reckless endangerment because he was driving "too fast" on his motorcycle.

The Defendant testified that he had received disability payments for ten years based on his bipolar disorder. He reported seeing two doctors since he began receiving disability payments. He stated that the first physician who treated him passed away and that he subsequently had trouble with his insurance and finding a new doctor. He testified that over a year elapsed before he found a second doctor, whom he had last visited approximately a month or two prior to the sentencing hearing. On redirect examination, a letter from Peninsula Outpatient Centers was entered into evidence showing that the Defendant was a current patient.

The State read into evidence portions of the probation report, in which the Defendant reportedly told his probation officer that while in the back of the police cruiser, he had asked why he had been arrested. According to the State, he was told to "shut up" or someone would "shut [him] up." In the report, the Defendant stated that he woke up in jail with his mouth and lips "busted so

bad [he] couldn't eat." However, at the hearing, the Defendant admitted that he was not suggesting that the officers hurt him.

The Defendant's mother, Katie Rose Franklin, testified that she had lived next door to her son for eleven years and that she sees him every day. Franklin testified that after the offenses in this case, the Defendant sought treatment. She stated he entered Peninsula Hospital and was placed on medication "which controls his temper." Franklin explained that the Defendant "had a very violent temper." She testified that since being treated, the Defendant had been making progress. Franklin testified that she insures that the Defendant takes his medication by giving it to him herself. She testified that she walks to the Defendant's home every morning and every evening to make sure that the Defendant takes his medication.

Franklin stated that she knew that the Defendant drank too much in the past, but she maintained that she had not seen him drink since he began treatment. Although Franklin testified that the Defendant had not had any alcohol in a year, she admitted on cross-examination that he would not tell her if he did drink. She testified that the Defendant would try to hide his drinking.

Franklin testified that she is the payee for the Defendant's Social Security disability checks. Franklin explained that the Defendant overdosed in Knoxville, Tennessee, and the Social Security board "had to have somebody to be over his check." She stated that although her name is on the checks, the checks are deposited into the Defendant's account. She also testified that she pays the Defendant's rent, makes sure his utilities are paid, and buys his clothing.

## II. ANALYSIS

The Defendant now challenges on appeal the trial court's order that he serve his entire four-year sentence in the Tennessee Department of Correction. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the

potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986), superceded by statute as stated in State v. George Blake Kelly, No. 01C01-9610-CC-00448, 1998 Tenn. Crim. App. LEXIS 1085, at *24 (Tenn. Crim. App., Nashville, Oct. 13, 1998).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

Specifically, the Defendant argues that he should have been granted some form of alternative sentencing. Tennessee Code Annotated § 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80

(Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a). The Defendant, as a standard offender convicted of a Class C felony, see Tenn. Code Ann. § 39-13-102(d), is presumed to be a favorable candidate for alternative sentencing as to the aggravated assault conviction.

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing Moss, 727 S.W.2d at 235). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if
> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); see also State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994).

In making its sentencing determination, the trial court found that alternative sentencing was not appropriate in this case because of the Defendant's "extensive criminal history of dangerous offenses, both driving under the influence and assault." The trial court acknowledged that the Defendant had taken steps toward rehabilitation. However, it noted that "continuing to drink, [regardless of] how small an amount[,] is totally contrary to any long-term rehabilitation, particularly when you're on medication that is not to be combined with alcohol and that is . . . one of the problems that keeps recurring in all of [the Defendant's] criminal cases and what was instrumental in this event." The trial court stated that the Defendant's "history of violence as shown by his criminal history and testified to by his mother and [his] continuing to drink makes him inappropriate for community release and for serving this sentence in the Community Corrections Program." The trial court also found that alternative sentencing would depreciate the seriousness of the offense.

In addition, the trial court found that the offense was committed when the risk to human life was high. The trial court stated, "Pointing a bow that's already been drawn back at someone takes a conscious decision not to let go of the bowstring. But this is an unusual case in that regard." The Defendant argued that the trial court should not have considered the high risk to human life because its consideration of this factor was equivalent to enhancing the Defendant's sentence based on an element of the offense. However, the information which charged the Defendant with aggravated assault alleged that the Defendant caused the victim to reasonably fear imminent bodily injury by using or displaying a weapon. The trial court correctly concluded that a high risk to human life is

not an element of the charged offense. Therefore, the fact that the Defendant created a high risk to human life was a proper sentencing consideration for the trial court.

In our view, the record supports the manner of service of the sentence imposed. The Defendant aimed a loaded weapon at a police officer, punched another police officer, and claimed that he did not remember anything because he had been drinking. The Defendant has a long history of criminal conduct involving alcohol, and he admitted at the sentencing hearing that he continues to drink on occasion. For these reasons, we conclude that the presumption of alternative sentencing was sufficiently rebutted in this case and that the trial court thus did not err by imposing a sentence of confinement.

Accordingly, we AFFIRM the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE