IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 20, 2002 Session

### STATE OF TENNESSEE v. REBECCA DAWN PERKINS

**Direct Appeal from the Circuit Court for Blount County**
**No. C-11998      D. Kelly Thomas, Jr., Judge**

_____

**No. E2001-02763-CCA-R3-CD**
**October 25, 2002**
_____

The Blount County Grand Jury indicted the Defendant for second degree murder, and following a trial, a Blount County jury convicted the Defendant of reckless homicide. The trial court sentenced the Defendant as a Range I, standard offender to four years for the crime and ordered that she serve her entire sentence in confinement. In this appeal as of right, the Defendant argues that she was improperly sentenced. Specifically, she contests the length of her sentence, and she contends that she should have been granted some form of alternative sentencing. Having reviewed the record, we conclude that the trial court did not err in sentencing the Defendant, and we therefore affirm the sentence imposed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Charles Deas, Maryville, Tennessee, for the appellant, Rebecca Dawn Perkins.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; Michael L. Flynn, District Attorney General; and John Anderson Bobo, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In December 1999, the Blount County Grand Jury indicted the Defendant, Rebecca Dawn Perkins, for second degree murder. The charge stemmed from the shooting death of victim Brian Butler, the Defendant's boyfriend and roommate at the time of his death. Following a trial, conducted in August 2001, a Blount County jury found the Defendant guilty of reckless homicide. The trial court sentenced the Defendant as a Range I, standard offender to four years and ordered that the sentence be served in confinement. The Defendant now appeals her sentence, arguing that she was improperly sentenced. Having reviewed the record, we affirm the sentence imposed by the trial court.

# I. FACTS PRESENTED AT THE TRIAL

Pursuant to Rule 24 of the Tennessee Rules of Appellate Procedure, the Defendant requested that the clerk of the trial court include specific portions of the trial transcript in the record on appeal.[1] Although we do not have the full trial transcript before us, we were able to glean the following facts concerning the nature and circumstances of the offense from the testimony of the Defendant's daughter, Natasha Perkins: Perkins, who was twelve years old at the time of trial and nine years old at the time of the crime, testified that at the time of the crime in this case, she was living with her mother, her two younger siblings, and the victim in a house in Friendsville, Tennessee. She recalled that on July 9, 1999, she went out to eat pizza with her mother and the victim. She testified that at the time, her two siblings were away at church camp. Perkins stated that during their drive home, her mother accused the victim of "being with other women," and the victim threw magazines, which they had received in the mail, out of the window of the car.

Perkins testified that when they arrived at their house, the victim grabbed "clip[s] that you put in the gun" from the floorboard of the car and got out of the car. Perkins stated that the Defendant told the victim to give her the clips and hit him three times on the head with a cigarette case. According to Perkins, the victim then ran into the garage and threw two of the clips underneath a wagon and one clip underneath a toy Jeep. Perkins reported that at this point, her mother began "beating on [the victim's] mom's car," which was parked "past the sidewalk steps," because the victim would not give her the "other three clips." Perkins recalled that while the Defendant hit the car, she was holding a gun and a cigarette case in her hands. Perkins testified that the victim then ran to the sidewalk, the Defendant "came after him," and the victim threw "the rest" of the clips on the ground.

According to Perkins, the Defendant picked up the clip closest to her and while holding her gun with both hands and two of her fingers on the trigger, "shot it through the ground once." Perkins stated that her mother then turned toward Perkins and the victim, turned away quickly, and shot towards some trees. Perkins stated that she and the victim were standing on the porch of their home when this happened, and after her mother fired the shots, the victim "kick[ed] one of the boards down on the door," "reached under," unlocked the door, and allowed Perkins to enter the house first.

Perkins recalled that as she began to walk into the house, the victim grabbed the Defendant's shoulders and attempted to pull the gun from the Defendant's hands "so she wouldn't try to shoot it again." Perkins testified that a struggle ensued, and during the struggle, the victim tripped over some shoes in the living room floor and landed on his knees. Perkins stated that her mother was still standing at this point, holding the barrel of the gun with both hands and with her fingers on the trigger, and the victim, who had his back turned toward her and also had his hands on the barrel of

---

[1] Although the Defendant requested complete trial transcripts of the testimony of the Defendant, her daughter, and Cleland C. Blake, M.D., the record on appeal contains only a transcript of the direct examination and cross-examination of the Defendant's daughter; and the cross-examination of Cleland C. Blake, M.D.

the gun, was trying to pull the gun away from his head. Perkins testified that as the victim attempted to wrest the gun from the Defendant's hands, "she shoved [the gun] back where his head was and . . . the gun went off." She testified that she did not see the victim's finger on the trigger when it fired. Perkins testified that she next saw a "big flash" and heard "a big loud noise," and the victim fell backwards, hitting some furniture as he fell. Perkins recalled that when the gun fired, she was "standing close enough . . . for the bullet to ricochet and . . . hit" her.

Perkins stated that her mother then "got up acting like she didn't know what to do" and went into an adjoining room to get the phone. Perkins recalled that she walked to the victim to check his pulse and heartbeat. She stated that when she placed her head on the victim's chest, she heard faint heartbeat, "but it was going down slowly." Perkins reported that at this point, the Defendant "jerked [her] back up" and told her to go to her room, where she waited for a few minutes until police arrived. She recalled that she then climbed out of her bedroom window and walked to the sidewalk, where a police officer met her and then escorted her to a police vehicle.

On cross-examination, Perkins testified that the victim "probably" drank beer before they left their home to go eat pizza. She stated that her mother also drank beer during the drive to the restaurant where they ate dinner. She recalled that the victim was driving at the time. Perkins further testified on cross-examination that she recalled telling a detective that the victim always kicked the door, resulting in a hole in the door, instead of hitting her mother "[b]ecause he cared for her too much."

## II. FACTS PRESENTED AT THE SENTENCING HEARING

The Defendant's sentencing hearing was conducted on October 15, 2001. The following evidence was presented at the hearing: Randy Smith, Director of Communications for Loudon County 911, testified that the Defendant was an employee of Loudon County 911. However, he stated that she resigned her position after testing positive for marijuana in a random drug screen. According to personnel records, the Defendant requested that her employer grant her a forty-five-day, unpaid leave of absence to attend a drug rehabilitation program. The records also indicated that the Defendant agreed that if she were granted the leave of absence, she would subsequently submit to monthly drug screens by her employer for an undetermined amount of time. Smith testified that he had no knowledge of whether the Defendant's request was granted because these events took place before he became Director of Communications. He reported, however, that the Defendant resigned her position on March 8, 1999. Smith testified on cross-examination that personnel records indicated that the Defendant had no criminal record. According to other records, the Defendant completed and became certified by several programs designed to train 911 operators.

Captain James B. Long of the Blount County Sheriff's Office stated that he acted as lead detective in this case. He introduced into evidence a photograph of the Defendant standing next to a marijuana plant on the back deck of the residence that she shared with the victim. Long stated that officers had seized the photograph from the home. He testified that officers had also seized a photograph of the Defendant, the victim, and possibly the Defendant's children standing next to

marijuana plants. In addition, Long testified that one of the investigators working on the case found at least one potted marijuana plant on a hill behind the home shared by the Defendant and the victim. Long further testified that a marijuana plant was found in a growing unit inside the home. He stated that he had no knowledge of who had grown the plant. Finally, he testified that blood tests performed on both the Defendant and the victim detected no marijuana in either individual's blood.

Officer Jeff Birchfield, a narcotics officer with the Blount County Sheriff's Office, testified that he had been working as a police officer for thirteen years and that he was assigned to the Fifth Judicial Drug Task Force. He identified the plants shown in the photographs seized from the Defendant's home as marijuana plants. He stated that the plants were between five and six feet in height and estimated that the plants were approximately forty-five days old. He also testified that the plants appeared to be healthy and probably had been given some type of extra nutrient to encourage their growth. Birchfield admitted that he did not see any paraphernalia or view the plants in the Defendant's home. He also stated that he did not know who had grown the plants.

Susan Butler Kneafsey testified that she was the victim's sister. She stated that at the time of the sentencing hearing, she was living in Los Angeles, California, where she had resided for shortly over two years. Prior to living in Los Angeles, she had resided in Lake Tahoe, California, and she reported that she was living in Lake Tahoe at the time of her brother's death. Kneafsey testified that because she lived out of town, she did not know the Defendant well. However, she stated that she "did have opportunity to witness the nature of [the] relationship" between the Defendant and the victim. She explained that her father had been diagnosed with terminal brain cancer approximately a year before her brother's death, and she testified that after her father's diagnosis, she returned home at least every other month and spent a "significant amount of time" at her father's home. She also stated that she spoke with her family on the phone "a minimum of probably every couple of hours every day."

Kneafsey testified that she generally saw her brother several times during each of her trips home. She stated that she also saw the Defendant and the Defendant's children, and she recalled that the Defendant spent several holidays with her family. Kneafsey testified that she and her family were initially unaware that the Defendant had three children, although the Defendant had spent Thanksgiving and Christmas at her family's home. She maintained that she never went to the house that the Defendant shared with her brother because she "was afraid for [her] own safety."

Kneafsey testified that she became aware that the Defendant and the victim had serious relationship problems after her father went to the Mayo Clinic in Rochester, Minnesota for radiation treatments. She stated that her parents "basically moved up there" for the duration of the treatments, and during this time, the victim remained in Tennessee to help take care of his parents' house and to "coordinate . . . a lot of the details." Kneafsey maintained that her brother did not go to Minnesota for Christmas "because he was afraid that [the Defendant] was going to destroy . . . a lot of his property." She further testified that during this time, the Defendant exhibited "extremely jealous behavior," and she stated that the Defendant did not want the victim to go to Minnesota because he would "be cheating on nurses at the hospital."

-4-

Kneafsey testified that one night while she was at her parents' home, the victim came to the home at approximately 11:00 p.m. with his two dogs. According to Kneafsey, the victim told his family that he and the Defendant had had an argument and that during the argument, the Defendant "started shooting inside the house." The victim reportedly told the Defendant that he was "going out for some wood" and instead put the dogs into his car and left the home before the Defendant realized that he was gone. Kneafsey recalled that when the victim arrived at their family home, he did not have dog food for his pets, so she accompanied him to the grocery store. Kneafsey testified that while driving to the store, the victim told her that their family "didn't know the half of the violence that [the Defendant] had committed against him." Kneafsey testified,

> He said he'd had bottles broken over his head. . . . And he indicated that these were repeated incidents . . . . I couldn't understand why he was still staying [in the house with the Defendant]. . . . [H]e seemed to feel like he owed [the Defendant] something or her child – I'm not sure who he felt the obligation to, her or her children, to not leave.

Kneafsey testified that her brother's death "was shocking . . . but was not really surprising" because her family knew that the Defendant "had already been shooting at [the victim] at previous times before." She maintained that prior to her brother's death, the Defendant regularly fired shots inside the home shared by the Defendant and the victim. Kneafsey recalled that after learning of her brother's death, she flew home to be with her family. She testified that after she returned home, the Defendant called her parents' house from jail, crying and asking for their help. Kneafsey stated, "I was . . . immediately struck by the fact that [the Defendant] was one hundred percent concerned about herself and . . . she had no remorse whatsoever about [the victim's] death and [no] concern about our family."

When asked how the victim's death had affected her family, Kneafsey responded, "[I]t completely changed the dynamics of our family." She also stated that she believed that her brother's death hastened her father's subsequent death. She stated that shortly after her brother's death, her father went through "the most dramatic change that [she had] ever seen in a person." She recalled that her father stopped speaking and began to use a wheelchair. Kneafsey testified that her mother had also been greatly affected by the victim's death. She testified, "The stress that it's put on both myself and my mother has been extremely high. . . . The shock value of it all is enough in itself but just trying to cope with everything, it's been difficult to say the least." Finally, she reported that her brother's death had placed a great financial burden on her and her family because she had spent a "tremendous amount of money" on plane tickets from California and on babysitting for her children during the trial.

In closing, Kneafsey requested that the Defendant receive the maximum penalty possible for her crime. She stated, "I feel that given [the Defendant's] background and her awareness with law enforcement, she was fully aware of the results that could come about . . . from using a firearm . . . in a home setting and around her children to having marijuana in the home." She also pointed out that at trial, the Defendant had admitted to drinking "a couple of Long Island Tea's [sic]" when she took her children to dinner at a bar. In addition, she stated that although the Defendant had been

prescribed medication for psychological problems, she had failed to take her medication regularly and properly. Kneafsey further testified that she believed that the Defendant's "actions were deliberate" and that the Defendant had a "violent nature." She stated that she believed that the Defendant needed to be separated from her children so that her children would not learn domestic violence from her.

On cross-examination, Kneafsey admitted that she knew that her brother had had alcohol and drug problems prior to his death. She maintained that she "had not seen any evidence of a drug problem in quite a while." Kneafsey reported, however, that her brother had been convicted in Kentucky of possession of marijuana. She also admitted that she had smoked marijuana with her brother "many, many years ago." Kneafsey stated that her brother told her that he drank a beer or two every evening before the Defendant came home "so he'd be able to take whatever she was going to dish out." However, she testified that she did not know the extent of her brother's drinking and therefore did not know whether he had an alcohol problem while he was living with the Defendant.

Kneafsey maintained that at the time of her brother's death, her brother had marks on his head from being beaten by the Defendant. She stated that at the time of his death, her brother was "kind of going through the motions with [the Defendant] but he was secretly planning to move home." Kneafsey testified that on the day after she arrived home after the victim's death, she, her family, and a friend went to the home where the Defendant and the victim lived and retrieved possessions belonging to the victim.

Carolyn Butler, the victim's mother, testified that her son was thirty-one years old at the time of his death. Butler stated that she met the Defendant a short time before the Defendant and the victim moved in together. She reported that the Defendant and her son often visited her home. However, she stated that she never went to their home because she "did not approve of them living together out of wedlock." Butler testified that the Defendant spent Christmas 1997 with the Butler family. She also testified that the Defendant lived at her home for at least two weeks while she was searching for jobs in Knoxville; Butler stated that the Defendant stayed in her home until Butler told her son that "it was time for [the Defendant] to get out." Butler testified that while the Defendant was living with her, the Defendant never mentioned her children, and Butler was therefore unaware that the Defendant had children.

Butler testified that the Defendant was "very controlling verbally and physically" with her son. She recalled that on more than one occasion when her son came to her house to mow their lawn, a process which Butler stated took three hours, the Defendant called their home after the victim had been there for fifteen minutes, and the victim then went home, saying, "I [sic] better go home, I'm already in trouble." Butler also testified that her son would not visit her house without the Defendant's permission.

Butler recalled that on one occasion, while the victim was visiting her home, he began crying and told her that the Defendant had hit him across his shins with a baseball bat. According to Butler, the victim told her that he had to leave work because he was in such pain. Butler claimed that she

saw her son's injuries; she specified that his shins looked reddish and bruised and that "his shins looked dented in the front." Butler recalled that on other occasions, her son had a black eye and a gash on his forehead, but he did not explain to her how he became injured.

Butler testified that on another occasion when the victim visited her home, he was very upset because the Defendant "was shooting up the house." According to Butler, the victim said, "I'm running out of money to repair things, I can't get them all repaired at one time." Upon his father's request, the victim later took photographs of the home that he shared with the Defendant. A couple of days after their conversation and a couple of weeks before his death, the victim brought a roll of film to his parents' home and put it in a cabinet, stating, "[I]f you need this, here it is." Butler stated that after her son's death, she remembered the undeveloped roll of film and gave it to Captain Long.

Butler testified that over a period of a couple of weeks, the victim brought some of his personal belongings which were "invaluable to him" to his parents' home to prevent them from being destroyed. She recalled that the victim also told his parents that he was "looking at property in Anderson County" and that he did not want to tell the Defendant that he "was planning to come home. . . . until he got ready to leave." She explained that the victim loved the Defendant's children, took care of them most of the time, and "wanted to make sure the children were taken care of before he left." Butler testified that on the day prior to his death, the victim told his parents that he "would be home the next day." She stated, "[H]is dad and I thought he told [the Defendant] and that that's why she killed him. Because she told him that if he ever tried to leave her, that she would kill him. And she said that on numerous occasions." She further testified that her son repeatedly told her and his father that the Defendant had threatened his life and that he was afraid of her.

Butler reported that the victim's death was "devastating" to the victim's father. She stated that after the victim died, her husband "went downhill" and was forced to begin using a wheelchair. She stated that her husband simply "couldn't cope with [the victim's] death."

Butler testified that she was aware that the victim had had problems with alcohol. She stated that he went through alcohol treatment at the University of Tennessee. She also reported that she and her husband became very involved with Al-Anon for four years.

Finally, Butler testified that she believed the Defendant was "mean" and "self-centered." She stated, "She doesn't even appear to care for her kids except when it's saving her life. She's never been remorseful to me or my family at all." She further testified that if the Defendant did not serve time in jail, she feared that the Defendant might harm her own child, Natasha Perkins, who testified against her at trial. She maintained that Perkins was afraid of her mother.

On cross-examination, Butler stated that she knew that her son had a severe alcohol problem and that during the five years prior to his death, he had a problem with marijuana. She stated that he entered into treatment and that the treatment worked for "quite a while," but ultimately her son began to have problems again. She further testified that the Defendant threatened to "turn him in" for a violation of his probation for his drug-related conviction if he left her.

-7-

Following Carolyn Butler's testimony, Captain Long was recalled to the stand. He identified photographs developed from the roll of film that was given to him by Carolyn Butler. He stated that the photographs depicted "holes in different places of the wall in the residence" shared by the victim and the Defendant. Long testified that a "spent round of a bullet" was found underneath or near the bed in the master bedroom inside the residence. He also recalled that he saw what appeared to be a bullet hole in the wall across from the bed. Long admitted that he did not know how the holes in the wall were made and that he did not know when the photographs on the roll of film were taken.

The Defendant testified that she was thirty-two years old and that she was living in Kentucky at the time of the hearing. She reported that she had three children: two girls, age twelve and ten, and a boy, age eight. She stated that she became divorced from Stacy Donovan Perkins, the father of her two girls, in July or August 1991. She stated that her former husband did not want to pay child support, so they engaged in a custody battle. As a result, her husband retained custody of her oldest child, while she retained custody of her youngest two children. She stated, "I've raised my children by myself for the last 10 years," and specified that at the time of the victim's death, she had all of her children with her. She explained that two of her three children, however, were away at church camp. The Defendant maintained that Carolyn Butler knew that the Defendant had children at the time she moved in with the victim. She claimed that when she told Butler about her children, Butler told the Defendant that the victim's grandmother did not need to know about the children.

The Defendant maintained that she had never been unemployed. She stated that at the time of the crime in this case, she was employed by the Anderson County Sheriff's Department as an officer in the detention center. She stated that prior to the crime, her supervisors were considering moving her into "transportation," which she explained was a job promotion. She testified that she eventually hoped to "work up into the detective section" and then attend law school. She also testified that her performance evaluations with the Anderson County Sheriff's Department were "normal." She stated that she was very "enthusiastic" about her work.

The Defendant testified that prior to her employment with the Anderson County Sheriff's Department, she was employed by the Loudon County Sheriff's Department dispatch center. She claimed that she resigned from her position there because she and the victim were looking for land in Anderson County where they could live, and she heard that the Anderson County Sheriff's Department was "desperate for people and . . . paid quite a bit more." She maintained that while employed in Loudon County, she received letters from families whom she had helped; she stated, "[T]hey were touched by the concern I had for them, the time that I spent with them." The Defendant admitted that she failed a drug screen by testing positive for marijuana during her employment in Loudon County. However, she stated that she was "shocked" and "upset" when she learned of the test results. She stated that at the time she learned the results, she had already applied for a job in Anderson County and had resigned from her position in Loudon County. She stated that she learned about her drug screen results when she went to the supervisor for her Loudon County position to inquire about returning to her job there. According to the Defendant, her supervisor told her that she would be allowed a second test or that she could attend a rehabilitation program. The supervisor also told the Defendant that her test results would be kept confidential.

The Defendant testified that prior to working as a dispatcher in Loudon County, she worked three jobs for a short time. She stated that she was employed by Bailey's Sports Bar, by Goody's, and by Now AudioVideo. She testified that she worked three jobs to support her children. She reported that during this time, the father of her oldest two girls was paying $200 per month in child support, and the father of her youngest child was not paying child support because he had been unemployed for some time.

The Defendant testified that she was previously employed for almost three years as a 911 communications officer for the Corbin City Police in Kentucky. She stated that she resigned from her position there after the victim was arrested in Kentucky for a drug-related charge because she "didn't want the controversy to come back on" her department. The Defendant stated that to become accredited as a 911 operator in Kentucky, she attended "the academy" at Eastern Kentucky University. She testified that she had also trained and worked as a firefighter and as an emergency medical technician. In addition, she reported that she had taken continuing education courses. Finally, the Defendant stated that she attended Cumberland College until the second semester of her sophomore year and that she worked on campus while there.

The Defendant testified that when she met the victim in 1992, she was dating one of his friends. She recalled that the victim asked her for her phone number on the first night that they met and began calling her. She testified that she later moved in with the victim and lived with him for sixteen to eighteen months before his death. The Defendant stated that she became aware that the victim had a trust fund prior to the time that she and the victim began living together. However, she maintained that she and the victim never discussed his trust fund while they lived together, and she claimed that she had no idea how much money he received from the fund. She denied staying with the victim because of his money.

The Defendant testified that she first became aware that the victim had a problem with drugs when they first began to live together, although she admitted that she was previously aware that the victim had been arrested on a drug charge in Kentucky. She recalled that while she and the victim were living together, "people were showing up at [their] house with more gold teeth than [she had] ever owned in [her] life." She also stated, "[The victim] kept waking me up at 5:00 in the morning thinking the newspaper man was the police. And he took my son's ambulance (phonetic) apart because it had baby powder in it. And when I asked him what was going on, he stated to me that he'd spent over $20,000 on crack cocaine." She testified that after she offered for the victim to move away with her, the victim, to the best of her knowledge, "dropped it cold turkey." The Defendant denied ingesting crack cocaine herself. She testified that during this period of time, the victim worked at several places, including a Burger King Exxon, a Dairy Mart Queen, and AudioVideo Now.

The Defendant maintained that the victim and his friend, Mike Kelly, grew the marijuana plants shown in the photographs obtained from her home, and she denied any involvement in buying or planting the plants. She stated that the victim and Kelly began the project together with seeds

saved over the years and were very excited about growing the plants. The Defendant testified that as the plants grew larger, she became afraid, so the victim bought other plants to place on their deck alongside the marijuana plants. She stated that the victim asked her to take a picture of him next to his marijuana plant, which she did, and that he then asked to take her photograph beside the plant. The Defendant stated that during the time that the victim began growing the plants, her children were not living with them, but when it became time for the children to live with them, she became afraid. She also stated that she was frightened that someone would see the plants, which were then six or seven feet tall, on their deck.

The Defendant reported that one evening, she and the victim were arguing about the plants when her father called. She recalled that she was "upset, crying, hysterical," and her father came to their house. She testified that when he arrived, she showed her father a marijuana plant, and her father told the victim to "get rid of it because the police would probably be coming." According to the Defendant, the victim threw ten or fifteen marijuana plants over the side of their deck into some English ivy. The Defendant stated that after this incident, the victim stopped smoking marijuana and taking "pills." She testified that he also stopped allowing friends to smoke marijuana inside their home.

The Defendant explained that the victim had never used the grow unit found inside their home. She stated that the victim got it from a friend's house, and she reported that she had no idea that plants were inside the unit because the unit stayed closed. She admitted, however, that shortly prior to his death, the victim began to grow marijuana plants in their attic. She stated that she told him that she did not like the plants being inside her home because she was a police officer with the Blount County Sheriff's Department, and she reported that she threw all of the plants over the deck of their home. She stated, "If I had any idea that [the grow unit contained] . . . three to five marijuana plants, it would've went over the deck . . . with the other 20 that I threw over the deck when I found them."

The Defendant testified that during her relationship with the victim, the victim "made . . . remark[s] about killing himself quite a bit." She stated that he was depressed about his father. She testified, "When he would get intoxicated, he would get angry. He would rip his shirts . . . . He would sit on the bed with his fists clinched [sic]. His eyes would be bulging, he would be red all over. I . . . have never been around anything like that and I didn't find out until after all this happened that due to his excessive use over the years that he may have done some damage."

The Defendant denied shooting at the victim inside their home. She stated that only two shots were fired inside the home, one on the night that the victim died and another shot that was fired accidentally. The Defendant explained that on an occasion when the victim was drinking, he was attempting to show the Defendant how to clean her shotgun, which, unbeknownst to them, was loaded, and the gun discharged. She also stated that there were a couple of holes in the home she shared with the victim when they moved in. The Defendant further testified that she had never broken a bottle over the victim's head. In addition, she denied hitting the victim with a baseball bat.

-10-

Finally, she denied giving the victim "a black eye." She stated that to her knowledge, the victim was never afraid of her.

> With regard to the victim's injuries, the Defendant testified as follows:
> [The victim] had many accidents from his alcohol intake, him burning his hands at times, he refused to go to the hospital. He would . . . have cuts and bruises where he'd fall. He would jump up on the steps and miss the steps sometimes when he was out cooking on the grill.
> . . . .
> The swollen foot where he couldn't get his boot fastened had nothing to do at all with a baseball bat. He had stepped on a [sewing] needle that had broken off in his foot and it kept getting worse and worse and worse. His foot was swollen and the infection was terrible. I thought it was a piece of glass . . . . He was pushing on it one day and it was so infected that when it pushed on it, the needle just popped out. And that's how we found out what it was.

The Defendant denied that she attempted to isolate the victim from others. She stated that she and the victim had two phone lines in their home, and she explained that the victim's sister often called their home on their computer line, which was connected to an answering machine. The Defendant stated that they did not often check the answering machine for messages. The Defendant also testified that the victim had an associates degree in business administration, and she hated to see him "wasting a degree." She stated that she encouraged him to work and compiled resumes for him.

The Defendant denied trying to control the victim. She testified,

> [The victim] was a grown man. [The victim] could make his own decisions. The only thing that I would even come close to saying that I tried to control him on is I would try very hard to give him advice and support to become a better person, because his indication to me was that he had never had that support, that he had had it for short periods of time and then it would be ignored.

The Defendant could not recall calling the victim's parents' home while the victim was mowing his parents' grass. She stated that she telephoned the victim's parents on one occasion because she wanted the victim to pick up bread on his way home. She stated that she also called their home several times on another occasion. She explained that the victim had begun to break belongings of hers, and she, in turn, broke his lava lamp. The Defendant reported that after their argument, the victim "immediately became submissive and started apologizing . . . , went out and picked some flowers, and [she] told him . . . that if he ever did anything like that again that [she] was going to contact his parents." She testified,

> I didn't know the situation at the time. I thought I could. And that they would be aware of his problem and would understand what I was dealing with but that I would call the police first and have him picked up, and as soon as he was picked up, I would

-11-

call them and tell them that I loved him but I couldn't handle the situation anymore and that I needed help.

The Defendant claimed that the victim then "got some guns down[,] put some shells in his book bag," and told her that if she called any of her "cop buddies . . . , he'd go up in the woods and shoot them down." The Defendant testified that after this incident, the victim took some of his personal belongings to his parents' home because she had broken his lava lamp. She stated that the victim told her that "he was afraid [she] was going to break something else of his."

With regard to the victim's drinking habits, the Defendant testified that she generally found two and a half empty beer cans hidden beside the refrigerator and that the victim was usually holding a half-full glass of beer when she went into the kitchen in the mornings. The Defendant maintained that the victim drank all day long, but did not drink a lot at a time until the evenings. She reported that during dinner, the victim began to drink more and often became "a little bit obnoxious" around the time that her children had finished their meals. The Defendant stated that at this time during dinner, she usually sent her children away so that they would not see the victim in an intoxicated state. She testified that approximately thirty to forty-five minutes later, the victim usually fell asleep in a chair, and she then awakened him and helped him into bed.

When asked whether the victim was planning to leave her at the time of his death, the Defendant responded, "I asked [the victim] to go home. I asked [him] to get an apartment. I said, 'You've got the money, if you're going to spend it, get you an apartment and let's work this out from a distance. I'll go home'. . . . He said he couldn't go home, his mom and dad would never agree with what he did."

The Defendant testified that she knew she would not marry or have a lasting relationship with the victim, but she "loved him very much as a friend and . . . wanted very much to help him better himself." With regard to accusations by the victim's family that she was not remorseful about the victim's death, the Defendant testified, "I don't know what the definition of remorse is but I went straight home to my parents, that I couldn't get out for three months, I couldn't talk to nobody [sic]. I slept in a bedroom with every light including the overhead light on. I had nightmares about [the victim]. I miss him still today." She testified that she kept a picture of the victim in her Bible and that she "talk[ed] to him every day." She stated that she called the victim's family following her arrest because her family was in North Carolina and because the Butlers were "like family" to her. She also stated that she did not call the victim's family again because they told her "never to call back" and because her lawyer told her that they "may misconstrue what [she] said to them."

When asked what her role was in the shooting death of the victim, the Defendant stated, "I wish I'd never told him I was leaving that day. I wished I'd have never had my gun around him even though it was normal. I wished I'd have never let him get the gun away from me." She also stated that she wished she had not had the gun "around [the victim] at all." The Defendant further testified, "I feel like it's my fault because if I hadn't told him I was leaving, then maybe he wouldn't have had one of his little fits, try to get my attention . . . . and that wouldn't have happened."

Finally, the Defendant testified that since the victim's death, she and her children had suffered. She stated, "I've spent two years without my kids and I've not done anything wrong." She also stated, "[The victim] deserved a whole lot better than what happened." When asked what she would like to say to the victim's family, she stated, "I would only tell them that I'm sorry about [the victim]. I'm sorry I couldn't fix him. I'm sorry I couldn't help him." She admitted that she was guilty of a crime and stated, "I have to accept what's happening. I have to just move on. I'm going to have to start all over again but that's okay. . . . I've been through a lot in my life. I guess I'll have to make it through this, too."

On cross-examination, the Defendant testified that while she was in Corbin, Kentucky, she went to the firing range once with her supervisor, a firearms instructor, to fire guns. She admitted that she did a good job at the firing range. She stated that she liked to "target practice" and often did so with the victim. She claimed that she bought a gun for protection, and she stated that the victim also bought her a shotgun. The Defendant denied that she fired the shot that caused the victim's death.

The Defendant also testified on cross-examination that a fireman who was "riding along" with the officer who arrested the victim in Kentucky was a man whom she had dated; she testified that he later became a police officer. She stated that she kept in contact with him and called him on a couple of occasions after the victim "would get upset and . . . get in his car and leave and it would scare [her]." When accused of threatening to call the victim's probation officer if he left her, the Defendant stated that she did not know that the victim was on probation while they lived together.

The Defendant admitted that officers found a marijuana pipe in a bedside table in her bedroom. However, she claimed that she and the victim never used the table and that she did not know how long the pipe might have been in the drawer. She also admitted that officers found a lock box in the closet containing drug paraphernalia, but she maintained that the victim had locked up the paraphernalia in the box because he was trying to quit smoking marijuana.

The Defendant further admitted that she had been taking anti-depressant medication. She stated that she began taking the medication for several reasons, including her "grandmother leaving home, [her] friends, [her] job." She testified that she stopped taking her medication when the victim died and that she resumed taking an anti-depressant three months prior to the sentencing hearing.

The Defendant also admitted that she tested positive for the use of marijuana in a drug screen conducted at the time of her presentence investigation. She stated that she told her probation officer that she had smoked marijuana once and that she would "probably test positive." In addition, the Defendant admitted that she had smoked marijuana on a second occasion a couple of days prior to her trial because she was "very anxious."

L.P. Partin, the Defendant's father, testified on her behalf at the sentencing hearing. He stated that the Defendant was the third of his five children. He testified that the Defendant had "always worked . . . probably too much." He stated that he had never known his daughter to hit

anyone. He further testified that his daughter was a good mother and had always provided for her children. He reported that the victim told him that he liked to shoot skeet.

Finally, the defense and the State agreed to a stipulation concerning a witness who could not be present at the sentencing hearing. They stipulated that the witness, Ester Marple, a principal at the Pleasantview Elementary School in Williamsburg, Kentucky, where all three of the Defendant's children had attended school, had known the Defendant in that capacity for approximately ten years. The parties stipulated that Marple "knows that [the Defendant] was attentive to all three of her children's emotional, and physical, and academic needs." The parties specified that Marple "would say that she has mainly known [the Defendant] . . . from encounters over the last 10 years, mainly in a school setting excepting for one or two occasions at a tea or a bridge tournament or game."

In addition, the parties entered in to evidence a copy of the Defendant's "Anderson County Sheriff's Department record." They stipulated that "there's nothing in the records excepting at the tail end after this incident when the marijuana plants were found in the home and she was involved with this incident. Otherwise, her performance evaluations were good and . . . she was a good employee until this incident with [the victim] . . . ."

## III. ANALYSIS

The Defendant contends that she was improperly sentenced. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a <u>de novo</u> review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely <u>de novo</u>. <u>State v. Shelton</u>, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); <u>State v. Williams</u>, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and

then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986), superceded by statute as stated in State v. George Blake Kelly, No. 01C01-9610-CC-00448, 1998 Tenn. Crim. App. LEXIS 1085, at *24 (Tenn. Crim. App., Nashville, Oct. 13, 1998).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the trial court in this case thoroughly considered the sentencing principles and all relevant facts and circumstances, our review in this case is de novo with a presumption of correctness.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

## A. LENGTH OF SENTENCE

The Defendant first contests the length of her sentence. As previously stated, the Defendant was convicted of reckless homicide, a Class D felony, see Tenn. Code Ann. § 39-13-215(b), and the trial court sentenced her as a Range I, standard offender. The appropriate sentencing range for a standard offender convicted of a Class D felony is between two and four years. See id. § 40-35-112(a)(4). The trial court sentenced the Defendant to the maximum sentence within the range.

In determining the length of the Defendant's sentence, the trial court applied enhancement factor (1), that "[t]he [D]efendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range . . . ." Id. § 40-35-114(1). In doing so, the court defined the history of criminal behavior as "using marijuana in the past, and being closely involved with the production of marijuana." The court stated that it was not sure of the extent of the Defendant's involvement with the use and production of marijuana, but it noted that she was involved with the drug "on more than one occasion." The court stated that the weight it granted this factor was "moderately heavy." The record supports the application of this factor.

The trial court also applied enhancement factor (9), that "[t]he [D]efendant possessed or employed a firearm . . . during the commission of the offense . . . ." Id. § 40-35-114(9). In applying

this factor, the court stated, "That has been established by the evidence, primarily by the evidence [presented by the Defendant's daughter,] and accredited by the jury or we wouldn't have the verdict that we have. That enhancing factor weighs heavily in my estimation." The record clearly supports application of this factor.

The trial court next applied enhancement factor (10), that "[t]he [D]efendant had no hesitation about committing a crime when the risk to human life was high . . . ." Id. § 40-35-114(10). This factor may be applied when a defendant's conduct causes a risk to persons other than the victim. See State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). In applying enhancement factor (10), the court explained, "[The Defendant's daughter] was there in the yard, in the house while this struggle over the gun, if you use her words, that resulted in [the victim's] death was going on. That gun could've wound up being pointed in just about any direction depending on when the trigger was pulled. Anybody in that room could've died." The record, which contains a transcript of testimony by the Defendant's daughter at trial, supports the application of this enhancement factor.

The trial court also applied two mitigating factors. First, it concluded that "[t]he [D]efendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct . . . ." Id. 40-35-113(11). The court stated that it granted this factor "some" weight. In addition, it considered the Defendant's lack of a prior criminal record as a mitigating factor. See id. §40-35-113(13). However, the court stated, "[T]he absence of a prior criminal record . . . is counterbalanced by the previous history of criminal conduct although it was uncharged and [was not] prosecut[ed]."

Based upon the three enhancement factors, the trial court increased the length of the Defendant's sentence to four years. It then stated, "The mitigating factors I do not think are significant enough in the weight under the facts of this case to reduce it beyond four years. If this was an eight-year or ten-year sentence, then I would think that there would be the slight mitigation . . . but not in this case." The trial court thus did not reduce the length of the sentence based upon the mitigating factors.

We find no error by the trial court in imposing a four-year sentence in this case. Although the Defendant argues that each of the above enhancement factors were improperly applied in this case and that the trial court should have applied two additional mitigating factors,[2] her arguments basically invite this Court to substitute its judgment for that of the trial court. As an appellate court, we must presume that the determinations made by the trial court are correct if there is an affirmative showing in the record the trial court has considered all appropriate principles, facts, and circumstances. Id. § 40-35-401(d); Ashby, 823 S.W.2d at 169. In this case, the trial court

_____

[2] The Defendant argues that the trial court should have applied as mitigating factors (1) that "[t]he [D]efendant acted under strong provocation," Tenn. Code Ann. § 40-35-113(2); (2) that "[s]ubstantial grounds exist tending to excuse or justify the [D]efendant's criminal conduct, although failing to establish a defense," id. § 40-35-113(3); and (3) that the Defendant "was trying to protect her daughter, Natasha." See id. § 40-35-113(13).

-16-

considered all appropriate principles, facts, and circumstances; made substantial findings, which we conclude are adequately supported by the record, and applied appropriate enhancement and mitigating factors. We therefore may not modify the length of the Defendant's sentence.

## B. ALTERNATIVE SENTENCING

The Defendant also challenges on appeal the trial court's order that she serve her entire four-year sentence in the Tennessee Department of Correction. She argues that she should have been granted some form of alternative sentencing. Tennessee Code Annotated § 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a). The Defendant, as a standard offender convicted of a Class D felony, see Tenn. Code Ann. § 39-13-215(b), is presumed to be a favorable candidate for alternative sentencing.

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing Moss, 727 S.W.2d at 235). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994).

In determining whether to grant or deny probation, the trial court may consider the circumstances of the offense; the defendant's criminal record, background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

In denying alternative sentencing in this case, the trial court concluded that "confinement is necessary to avoid depreciating the seriousness of this offense." It explained, "This was not a reckless act like someone throwing a concrete block off the top of a tall building and not knowing if it would hit somebody or not. This recklessness was directed at one . . . identifiable present person. I think that increases the seriousness of this as opposed to any kind of reckless homicide."

The trial court also considered the likelihood of rehabilitation in denying alternative sentencing. Regarding this consideration, the court addressed the Defendant as follows:

> The likelihood of rehabilitation. . . . [T]ruthfully I was expecting that to be a closer question than it turned out to be because I anticipated the evidence about your good work record. And I thought that the proof would probably establish that you had been up to the period of time that you were living with and interacting with [the victim] a good mother. But there are two things that make me think the likelihood of rehabilitation [is] poor . . . .
>
> Number one is that you still don't accept responsibility for what you did that led to [the victim's] death. It wasn't just going in the room with a gun. . . . [H]e didn't shoot himself. It was struggling with him over the gun and fighting with him with the gun that you did and knowing his state of mind and his state of intoxication while you made those decisions.
>
> The other thing is . . . that you violated the law by smoking marijuana after you were convicted of this offense by a jury and knew that you were facing a possible prison sentence. And then you went to the probation officer for the presentence report and had a drug test and admitted that you had used and flunked the drug screen and then did it again. And in my way of thinking [if] a person . . . can't follow what would be the rules of probation for a few short weeks between conviction and sentence with the threat of a sentence over their head, there is no chance in the world that they would follow it after that threat had passed in the years to come.

In reviewing the trial court's findings concerning the likelihood of rehabilitation in this case, we note that this Court has held the Defendant's "credibility and willingness to accept responsibility for his [or her] crime are circumstances germane to his [or her] rehabilitation." See State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996).

We conclude that the trial court's findings concerning the denial of alternative sentencing are adequately supported by the record. The State presented sufficient evidence to rebut the statutory presumption of alternative sentencing in this case. We therefore conclude that the trial court did not

err by ordering the Defendant to serve her four-year sentence in confinement.  Accordingly, we AFFIRM the judgment of the trial court.


                                                _____

                                                ROBERT W. WEDEMEYER, JUDGE